### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| COREY KHANSARI, | § | |
| DEBRA KHANSARI and | § | |
| MICHAEL KHANSARI, | § | |
| | § | |
| *Plaintiffs* | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| CITY OF HOUSTON, JOHN DOE I, | § | |
| JOHN DOE II, JOHN DOE III, | § | |
| and JOHN DOE IV, | § | |
| *Defendants* | § | |

## PLAINTIFFS COREY KHANSARI, DEBRA KHANSARI, AND MICHAEL KHANSARI'S ORIGINAL COMPLAINT

Plaintiffs Corey Khansari ("Corey"), Debra Khansari ("Mrs. Khansari"), and Michael Khansari ("Mr. Khansari") bring this suit, claiming that Defendants, the City of Houston (the "City") and several police officers with the Houston Police Department (the "Officers"), acting under color of state law, deprived Corey of his rights under the United States Constitution. Plaintiffs also claim that Defendants' acts were negligent for which they are liable under the Texas Tort Claims Act ("TTCA"). Plaintiffs Mr. and Mrs. Khansari assert bystander claims for their individual injuries.

### I.     PARTIES

1.     Plaintiff Corey Khansari is an individual that is a citizen and resident of the State of Texas. Corey was a 19 year old young man living with his parents in Houston, Texas at the time of the events made the basis of this lawsuit.

2.     Plaintiff Michael Khansari, Corey's father, is an individual that is a citizen and resident of the State of Texas.

3.     Plaintiff Debra Khansari, Corey's mother, is an individual that is a citizen and resident of the State of Texas.

4.     Defendants, police officers John Does I through IV (the "Officers"), are all individuals who upon information and belief are citizens and residents of the State of Texas and employees of Defendant the City of Houston, a municipal government in the State of Texas.  At all relevant times, John Does I through IV acted as agents, servants, and/or employees of the City under color of the state law of Texas.  Plaintiffs reserve the right to amend this complaint to name and serve the officers temporarily identified as "John Does I through IV."

5.     Defendant the City of Houston is a municipal government in the State of Texas that may be served by delivering a copy of the summons and of the complaint to the City Secretary of the City of Houston, Anna Russell, at 900 Bagby, P. 101, Houston, Texas 77002.  *See* TEX. CIV. PRAC. & REM. CODE 17.024(a).  The City operates and is responsible for the police department and is therefore liable for the conduct of the Officers.  Furthermore, the City is liable for its constitutional violations as described herein.

## II.     JURISDICTION AND VENUE

6.     Plaintiffs bring this action under the U.S. Constitution, 42 U.S.C. §1983, and state law, including the Texas Tort Claims Act ("TTCA") (TEX. CIV. PRAC. & REM.

CODE 101.001, et. seq.).  Jurisdiction is based on 28 U.S.C. §§1331, 1343(a)(3)-(4).

7.     Jurisdiction over the Plaintiffs' TTCA claims arises under TEX. CIV. PRAC. & REM. CODE §101.021, 101.025, 101.102 & 101.215.  The Officers' misuse of tangible personal property caused Corey's severe and permanent injuries.  Plaintiffs invoke the supplemental jurisdiction of the Court, pursuant to 28 U.S.C. §1367(a), to consider their state law claims.

8.     Venue is proper in this Court under 28 U.S.C. §1391(b)(1)-(2) because Defendants reside and have offices in this district and division.

### III.   CONDITIONS PRECEDENT

9.     All required conditions precedent have been performed or have occurred.

### IV.   COMPLIANCE WITH NOTICE PROVISIONS

10.     Plaintiffs timely presented their claims to Defendants, who have received actual and constructive notice of Plaintiffs' claims as required by TEX. CIV. PRAC. & REM. CODE §101.101.

### V.   STATEMENT OF FACTS

11.     Since Corey was a young child, he has suffered from severe allergies.  He is allergic to many things, including many types of pollen, shellfish, peanuts, and certain kinds of medication, such as benzodiazepine.  Because of this condition, Corey has suffered anaphylactic shock several times throughout his life and has had to carry with him an epinephrine pen at all times, in order for him to medicate in the event of a severe allergic reaction.

12.     In the days and weeks prior to November 25, 2011, Corey, then nineteen (19), was suffering from anxiety as a result of his severe allergy condition.  Because of this anxiety, Corey's doctors prescribed several medications for him, including Clonazepam, Xanax and Depacote.  Corey took the drugs according to the doctor's instructions, but they had a negative effect on him, causing thoughts of suicide and depression and causing him to sleep for long periods of time.

13.     On November 25, 2011, Corey slept most of the day.  When he awoke in the late afternoon, Mrs. Khansari saw him mumble strangely to himself and then saw him take a large number of medication pills.  This caused Mrs. Khansari to fear that Corey had attempted suicide and that his life was in jeopardy.  Alarmed, she told Mr. Khansari immediately, who then called 9-1-1.

14.     Shortly after Mr. Khansari called 9-1-1, an ambulance arrived at the Khansari home.  One of the paramedics approached Corey, and Corey emphatically informed him that he did not wish to go with them in the ambulance.  The paramedic informed Mrs. Khansari that they would be calling for another ambulance for back-up.

15.     Shortly afterwards, Mrs. Khansari was in the front yard of their home when, to her surprise, a Houston Police Department patrol car arrived.  A female police officer came out of her squad car armed with a long gun and appeared to put a round in the chamber as if preparing to fire.  Mrs. Khansari asked the officer, "What are you doing?"  The officer replied "I might have to kill someone" or words to that effect.  Mrs. Khansari was upset by this statement and explained to the Officer that Corey had taken lots of medication pills and needed his stomach pumped.  Mrs. Khansari repeated that

there was no need for the Officer to be using a gun as no one at the Khansari home was armed and as there were no guns at the Khansari home.

16.    Within the next few moments, additional Officers arrived at the scene, and several of them were also armed with long guns.  At that point, Corey had walked out of the front door of the Khansari home and was standing in the yard near the front door. The Officers pointed their weapons at Corey.  Red laser beam dots appeared on Corey, which terribly frightened Corey and his mother.  They feared that the Officers were going to shoot Corey.

17.    Trying to calm the situation and prevent injury to her son, Mrs. Khansari interposed herself between the Officers and Corey, repeating that their weapons were unnecessary and that the Khansaris were unarmed.  At this time, red laser beam dots appeared on Mrs. Khansari.  Several of the officers were shouting.  Fearing that his mother was in danger of being shot or of having a heart attack, Corey pushed Mrs. Khnasari out of the line of fire.  Immediately, an Officer used a taser to strike Corey in the face and on his head.  One of the taser darts pierced Corey's right eye.

18.    After being shot with the taser and receiving incapacitating electricity, Corey fell to his knees and was severely disoriented.  Mr. Khansari, seeing this, was overwhelmed and fell to the ground.  After a few seconds, Corey tried to get up and was shot with a taser by at least two other Officers in the torso and legs.

19.    Although severely disoriented and in severe pain, Corey was able to rise to his feet and go back into his house.  Once inside his home, Corey went to the living room mirror and pulled the taser dart out from his right eye, suffering excruciating pain and

bleeding profusely.  Corey then went into the kitchen and from a kitchen window could see the Officers outside pointing their guns directly at him, at which point he ducked and moved away.  At that point, Mrs. Khansari called Corey on the telephone, and he answered.  Mrs. Khansari tried to get an Officer to speak with Corey, but they ignored her requests.  However, Mrs. Khansari was able to give her cell phone to a fireman who was present.  Corey then told the fireman that he was planning on coming out with his hands over his head.  Corey could hear the fireman screaming at the Officers to stop their assault.  Then, true to his word, Corey came outside and submitted to the Officers, at which point one of the Officers kicked him to the ground.

20.     Corey was taken to St. Joseph Hospital for treatment of his injuries, including the severe injury to his eye.  As a result of the taser shot to his eye, Corey suffered and continues to suffer from severe and permanent damage to his optical nerve and retina, losing vision in his right eye.  As a result of Defendants' acts, Corey has undergone six surgical procedures for the injuries to his right eye, and his medical treatment is ongoing.  Corey feels frequent severe pain on the right side of his face and head that prevents him from doing many things he used to do and that has significantly impacted his life for the worse.

21.     At no time on November 25, 2011 did Corey have a weapon.  At no time on that day did he give anyone any reasonable belief or suspicion that he had a weapon or could obtain a weapon.  On that day, Corey made no threats to harm or endanger any another person, including the Officers.  Corey was never arrested or charged with or even

suspected of having committed any crime. To date, Corey has no criminal record and has never been a suspect in any criminal investigation.

22.     At the time of the above described events of November 25, 2011, the Defendant Officers were acting under color of the laws and regulations of the State of Texas and the City of Houston. Despite Plaintiffs' efforts at obtaining the information that would identify the officers involved, the City has refused to provide such information and Plaintiffs must obtain expedited discovery and then, based upon information provided, amend their complaint to include the officers involved. At the time of this incident, Defendant the City of Houston had policies and/or customs in place, more fully described below, that enabled its agents and employees to act with deliberate indifference to the constitutional rights of individuals.

## VI.     CAUSES OF ACTION

### A.     Excessive Force Claims against the Officers in their Individual Capacities

23.     The Officers violated Corey's constitutional right to be free from unreasonable seizure of his person when they used objectively unreasonable force in restraining Corey's liberty, causing him severe personal injuries. The Officers violated Corey's rights to life and the integrity of his person. The Fourth Amendment of the United States Constitution fully protects these rights.

24.     Many of the Officers' acts were objectively unreasonable. First, the Officers failed to obtain necessary information relating to the circumstances before encountering the Khansaris or approaching Corey.

25.     Second, the Officers failed to assess the relevant circumstances before using excessive force against Corey.  An objective bystander would have observed that the young man was unarmed and failed to present any real threat to himself or those surrounding him.

26.     Third, the Officers' use of excessive force did not relate to a proper or conscious assessment of danger.  The Officers' choices were objectively unreasonable under the circumstances and unconstitutional.

27.     Fourth, the Officers failed to respond to Corey's behavior proportionately. The use of any force, especially such force as was used, with an emotionally disturbed teenager under these circumstances is objectively unreasonable and unconstitutional.

28.     Fifth, Corey never presented any danger to himself, others, or the Officers. He was obviously disoriented and unarmed.  The number of tasers deployed and the manner in which they were deployed was excessive to the circumstances and unnecessary.

29.     Finally, tasers should never be aimed at or deployed into a person's face. Yet one or more of the Officers deployed a taser into Corey's right eye, causing him severe personal injury.

### B.     Mr. & Mrs. Khansari's Bystander Injury Claims

30.     Mrs. Khansari is Corey's mother.  She was witness to the entire terrifying event, which began with the female Officer who first arrived wielding a long gun.  She was within feet of her son when he was shot by taser darts.  She observed that he was shot in the face and that he had pulled a taser hook out of his eye.  She suffered shock as

a result of the direct emotional impact upon her from her contemporaneous observance of the events.

31.     Mr. Khansari is Corey's father.  He was also a short distance away from Corey when the events described herein unfolded.  He also observed Corey being shot by tasers, including the taser hooks into his face and eye.  He suffered shock as a result of the direct emotional impact upon him from his contemporaneous observance of the events.

32.     Mr. and Mrs. Khansari have suffered and continue to suffer extreme emotional distress as a result of the conduct of the Defendants and are entitled to mental anguish damages in the past and future.

### C.     The City's Failure to Train and/or Supervise the Officers

33.     The City is liable to Plaintiffs under 42 U.S.C. §1983 because its failure to train and/or supervise the Officers amounts to deliberate indifference to the rights of persons, such as Corey, with whom the Officers come into contact and because this failure on the City's part was the moving force behind the Officer's deprivation of Corey's constitutional right to be free from unreasonable seizure of his person.  *See City of Canton v. Harris*, 489 U.S. 378, 389-90, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Additionally, the City is liable under 42 U.S.C. §1983 because it was deliberately indifferent by failing to provide further training/supervision after learning of a pattern of constitutional violations by its employees.  *See Id*.

34.     The City had a constitutional duty to supervise and/or train its Officers and protect Corey from wrongful acts, omissions, and unconstitutional use of force.  The City

9

failed to properly supervise its Officers.  This failure to supervise was deliberately indifferent to Plaintiffs' constitutional rights because proper training and/or supervision would ensure that Corey would be free from unlawful seizure of his person and would be safe and secure from undue, unreasonable, excessive, and deadly force.

35.     Further, the City's supervisory policies are unconstitutional in the following areas:

a.     Improper responses to requests for service, such as requests for a crisis intervention team officer;

b.     Inappropriate communications of crisis intervention requests for a mentally-ill individual;

c.     Not dispatching appropriate personnel to respond to mental health calls;

d.     Improper use of non-lethal weapons, such as batons and chemical spray;

e.     Improper use of a taser;

f.     Improper use of non-lethal self-defense measures;

g.     Inadequate management and detention of persons with mental impairments;

h.     Excessive use of force and use of deadly force;

i.     Deficient use of crisis intervention techniques; and

j.     Not providing proper and adequate information for first response officers.

36.     The actions and omissions of the Officers' supervisors constituted supervisory encouragement of the use of excessive force.  This grossly inadequate supervision was caused by Defendants' deliberate indifference to the rights of individuals

with whom the Officers would come into contact, such as the Plaintiffs, not be subjected to constitutional deprivations.

37.     The City's constitutionally-flawed supervision of the Officers deprived the Plaintiffs of their constitutional rights and proximately caused Corey's injuries.

38.     The City's law enforcement training policies are unconstitutional in that they fail to provide for:

     a.    Proper communication of crisis intervention requests for mentally-ill persons;

     b.    Proper responses to requests for a crisis intervention team officer;

     c.    Dispatching appropriate personnel to respond to mental health calls;

     d.    Appropriate and adequate information for first response officers.

     e.    Proper use of non-lethal weapons, such as batons and chemical spray;

     f.    Proper use of a taser;

     g.    Proper use of non-lethal, self-defense measures;

     h.    Appropriate management and detention of persons with mental impairments; and

     i.    Limiting excessive use of force

39.     The City's improper and inadequate training of Officers with regard to detention, proper use of weapons, proper interrogation and arrest procedures, and the use of excessive force amounts to deliberate indifference toward the Plaintiffs' constitutional rights and was the moving force behind Defendants' deprivation of Plaintiffs' constitutional rights.

40.     The City failed to train and/or supervise its Officers to handle a recurring situation with obvious potential for a constitutional violation.  The City knew that there would be recurring situations involving emergency calls relating to encounters with citizens experiencing an emotional disturbance and acknowledged the potential for constitutional violations in such encounters.  Yet the City failed to train its Officers to handle such situations, which was the direct and proximate cause of the severe injuries to Corey.  Furthermore, the City's chain of command and supervision failed to meet its supervisory obligations to ensure that these Officers were prepared to encounter citizens who are experiencing an emotional disturbance.

41.     Further, the City knew of a pattern of ongoing constitutional violations of the rights of the individual in Harris County experiencing an emotional/mental disturbance.  The City demonstrated deliberate and knowing indifference to the acknowledged pattern of violations by failing to provide any additional training or supervision related to encounters with people who are experiencing an emotional disturbance.

42.     Further, the City knew and acknowledged the potential for constitutional violations with respect to lack of training in tasers and appropriate use of force.  Yet the City failed to train its officers with respect to appropriate use of tasers in citizen encounters.  Specifically, the City failed to train any of its officers regarding the effect of tasers, the potential for serious injury and/or reasonable discharge of the device.

43.     The City is liable under both *City of Canton* bases for failure to train/supervise.  First, there was a recurring situation that presented an obvious potential

for a constitutional violation and the City's failure to train/supervise its Officers resulted in a constitutional violation.  Second, the City was deliberately indifferent by failing to provide further training/supervision after learning of a pattern of constitutional violations. As a direct result of these constitutional violations, Corey and his parents suffered damages.

44.     At the time of his injuries, Corey had a clearly established right to be free from excessive force and unreasonable seizure of his person and to be treated as an emotionally disturbed citizen.  Defendants deprived Corey of those rights and, in so doing, caused him severe personal injuries.

### D.     The City's Unlawful Policy and Custom

45.     The City's Chief of Police is an official policymaker.  Causing the improper transfer of critical information to first responders, improper and inaccurate responses to requests for a crisis intervention team ("CIT") officer, and unnecessary weapon use on mentally-ill/emotionally disturbed detainees forms an official municipal policy of the City of Houston.  Further, this conduct rises to Houston Police Department ("HPD") custom because the HPD policymaker has tolerated and acquiesced to such behavior.  The policy and custom includes the use of excessive force against mentally-ill and/or emotionally disturbed arrestees and detainees under the City's care.  Such policy and custom violates Fourth and Fourteenth Amendment protections, as to Corey and his parents, respectively.

46.     The City's Chief of Police had policymaking authority both explicitly through the City's written ordinances and implicitly as a result of the delegation of

authority and the customs and practices of the City of Houston City Council. The Chief had authority to establish binding city policy respecting matters relating to the police department and to adjust that policy for changing circumstances. Such authority is reflected in the City's ordinances delegating all policymaking authority for the police department to the Chief.

47. Emergency services' failure to dispatch information on Corey's mental health condition and of the need for a crisis intervention specialist also followed the City's policy and custom. Additionally, the dispatch official's failure to code Mr. Khanasari's call as a CIT call or to dispatch properly trained CIT officers was according to the City's policy and custom. Each of these policies and customs deprived the Plaintiffs of their constitutional rights. This was not a single isolated incident, but an established pattern of practice on the part of the City.

48. The City's police department's response to the call for help from the Khanasaris followed the City's established policies and practices in terms of failing to obtain appropriate information relating to the circumstances surrounding the need for services, failing to provide thorough information to the officers dispatched, and failing to require the officers to implement CIT procedures on this call. The City had a long pattern and practice of handling mental health calls in the same manner. The Chief and/or relevant policymakers had actual and/or constructive knowledge of these policies and practices.

49. The Officers' unreasonable and excessive use of force followed the City's policies, procedures, practices, and customs. In fact, the City's practices and customs

allowed for and even directed an excessive use of force response to the Khansaris'
circumstances.  The practice or custom of the City when dealing with an emotionally
disturbed/mentally ill individual is to use unnecessary force.  Such a custom and practice
is unconstitutional and was the direct and proximate cause of the severe injuries to Corey
and the damages to Plaintiffs.

50.     The City's deficient custom, policies, procedures, and practices regarding
emergency communications, the transfer of information within the police department, the
dispatch of inappropriate personnel, and the improper and unreasonable use of force
amounted to conscious disregard and deliberate indifference to the right to be free from
excessive and deadly force.

51.     The deficient customs, policies, and practices are a direct and proximate
cause of the unlawful use of excessive force against Corey. These deficient policies,
procedures, practices, and custom proximately caused the unconstitutional use of force
against Corey.  As a direct result of these constitutional violations, Corey suffered severe
injuries and damages.

52.     The Supreme Court has identified a municipal "policy" even where the
policymaker has failed to act affirmatively at all, so long as the need to take some action
to control the agents of the government "is so obvious, and the inadequacy [of existing
practice] so likely to result in the violation of constitutional rights, that the policymake[r]
...can reasonably be said to have been deliberately indifferent to the need." *City of
Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).  In
this regard,

> the policymaker's toleration of the subordinates' behavior establishes a policy-in-practice just as readily attributable to the municipality as the one-act policy-in-practice described in [City of Canton]. Such a policy choice may be inferred even without a pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference.

*Id.*, at 390, 109 S.Ct., at 1205, n. 10.  In this case, the need for action by the Chief is so obvious that the failure to act rises to the level of deliberate indifference.

53.     The City's police department has an informal custom, practice or policy regarding the use of deadly force, which includes, but is not limited to:

a.      Allowing, encouraging, requiring, and training officers to use less than lethal weapons in lieu of less harmful techniques, including non-lethal physical restraints or proper detention techniques;

b.      Allowing, encouraging, requiring, and training officers to use non lethal weapons as a first resort, rather than training them to assess the situation and use only necessary force;

c.      Allowing, encouraging, requiring, and training officers to confront mental health detainees in such a way as to lead to the officer's use of excessive force;

d.      Failing to establish policies to ensure that CIT requests are communicated properly within the department and to patrol officers with adequate training;

e.      Falling to establish the necessary policies for officers responding to service calls involving mentally impaired individuals;

f.      Failing to establish policies necessary to dispatch CIT officers for calls involving mentally impaired individuals; and

g.      Failing to establish policies to separate service calls for persons in mental health crisis situations from regular calls.

54.     As part of these policies, customs, and practices, the City trains officers to

assess situations according to an "action/reaction" motive. The City trains officers and expects them to use excessive force before a person has a chance to act. Consequently, the City's officers, including these Defendants, rely on excessive force as their primary enforcement tool.

55. The City's toleration of its officers' behavior as described herein establishes a policy-in-practice just as readily attributable to the municipality as the one-act policy-in-practice described in *City of Canton*. Such a policy choice may be inferred even without a pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference.

56. The governing body of the City's police department, whether the Court believes it to be the City Council or the chain of command within the precinct, failed to provide policies or procedures for mental health officers to interact with mental health patients and failed to provide policies or procedures for interaction with mentally ill citizens.

57. Additionally, the practice in the City of treating mental health encounters the same as criminal arrests even though the CIT provided by the state directed otherwise evidenced a knowing and deliberate indifference to the rights of the City's inhabitants.

### E.     The City's Ratification

58. The governing body of the City, whether the Court believes it to be City Council or the chain of command within the precinct, failed to provide policies or procedures for mental health officers to interact with people with emotional disturbances.

59. Additionally, the practice at the City of treating mental health encounters

the same as criminal arrests even though the CIT provided by the state directed otherwise evidenced a knowing and deliberate indifference to the rights of the city's inhabitants.

60.      Finally, the City's practice of using excessive force on mental health calls when such were known to be dangerous and had even been banned by the International Association of Chiefs of Police evidenced a knowing and deliberate indifference to the rights of its inhabitants.

61.      The City ratified the Officers' conduct by knowing of and approving their specific decisions and specific actions in this incident, including but not limited to the deployment of a taser when not necessary under the circumstances, escalating the encounter and/or deploying a taser into the face and eyes of an individual.  As a result, the City is responsible for the Officers' constitutional violations.

**F.      Claims under the Texas Tort Claims Act**

62.      Pursuant to the Texas Tort Claims Act ("TTCA") (TEX. CIV. PRAC. & REM. CODE 101.001, et. seq.), and Texas common law, the City is liable for the actions of its employees, including the Officers.

63.      The City is a governmental unit covered by the TTCA.  The Officers, while acting within the scope of their employment with the City, owed duties to Plaintiffs and breached those duties, thereby proximately causing Plaintiffs' damages, and were therefore negligent.  While the Officers were negligent, they used or misused tangible personal property.  Corey's injuries and Plaintiffs' damages were proximately caused by the Officers' use or misuse of tangible personal property.  The Officers would have been personally liable to the Plaintiffs under Texas law.  No exception to the waiver of

immunity bars Plaintiffs' TTCA claims.  Notice was provided to the City as required by the TTCA.

64.     The City is liable under the TTCA to Plaintiffs for the injuries sustained to Corey and for the damages suffered by Plaintiffs.  Corey may recover individually for his injuries sustained as a result of the use of personal property, including the tasers.  Mr. and Mrs. Khanasari may recover individually for their severe mental anguish and emotional distress caused by Defendants' negligence and gross negligence.

## VII.   DAMAGES

65.     As a direct and proximate result of Defendants' actions, Corey suffered and continues to suffer the following actual damages.

    a.     Medical expenses in the past and future;

    b.     Loss of earning capacity in the past and future;

    c.     Physical impairment in the past and future;

    d.     Physical pain in the past and future;

    e.     Mental anguish in the past and future; and

    f.     Disfigurement in the past and future.

66.     As a direct and proximate result of Defendants' actions, Mr. & Mrs. Khansari suffered and continue to suffer mental anguish in the past and future.

67.     Because the Officers acted willfully, intentionally, or with reckless and callous indifference to Corey's civil rights, Plaintiffs seek punitive damages.

## VIII.  JURY DEMAND

68.     Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution and demand, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## IX.  ATTORNEYS' FEES

69.     Plaintiffs are entitled to recover attorneys' fees, costs, litigation expenses, and expert fees, as allowed, pursuant to 42 U.S.C. §1988, 12205.

## X.  JOINT AND SEVERAL LIABILTY

70.     All Defendants are jointly and severally liable.

## XI.  CONCLUSION AND PRAYER

71.     For all the foregoing reasons, Plaintiffs pray for judgment against all Defendants for actual and compensatory damages, declaratory relief, injunctive relief, reasonable attorney fees, post-judgment interest, and costs of suit.  Plaintiffs also pray for punitive damages against Defendants.  Finally, Plaintiffs seek all other additional relief as the Court deems just and proper.

Respectfully submitted,


/s/ Mario E. de la Garza
Mario E. de la Garza
Attorney-In-Charge
State Bar No. 24040785
Federal I.D. No. 564456
TUCKER, BARNES, GARCIA & DE LA GARZA, P.C.
712 Main Street, Suite 1600
Houston, Texas 77002
(713) 228-7425
(713) 228-7329 (fax)

Susan E.  Hutchison
Texas Bar No. 10354100
Federal I.D. No. 759287
HUTCHISON, LEWIS & DAUPHINOT, P.C.
611 S. Main Street, Suite 700
Grapevine, Texas 76051
(817) 336-5533
(817) 336-9005 (fax)

ATTORNEYS FOR PLAINTIFFS