IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COREY KHANSARI,<br>DEBRA KHANSARI, and<br>MICHAEL KHANSARI,<br><br>      Plaintiffs,<br><br>v.<br><br>THE CITY OF HOUSTON, CHIEF OF<br>POLICE CHARLES A. MCCLELLAND,<br>JR., OFFICER WILLIAM E.<br>RUTHERFORD, OFFICER CANDACE M.<br>BRADSHAW VAUGHN, OFFICER<br>JILLIAN MCGOWAN, OFFICER MARIA<br>HERNANDEZ, OFFICER SEAN HUNTER,<br>OFFICER JORGE LUIS HERRERA,<br>and OFFICER WALTER GAW,<br><br>      Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. H-13-2722 |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Corey Khansari ("Corey"), and his parents, Debra Khansari ("Mrs. Khansari"), and Michael Khansari ("Mr. Khansari"), bring this action against defendants, the City of Houston, Chief of Police Charles A. McClelland, Jr., and individual police officers William E. Rutherford, Candace M. Bradshaw Vaughn, Jillian McGowan, Maria Hernandez, Sean Hunter, Jorge Luis Herrera, and Walter Gaw, under 42 U.S.C. § 1983 for violation of civil rights guaranteed by the Fourth Amendment to the United States Constitution, and in the alternative, bring claims against the City of Houston for negligent conduct of its employees under the Texas Tort Claims Act ("TTCA"). Pending before the court are the City of Houston's Rule 12(b)(1)

and 12(b)(6) Partial Motion to Dismiss Plaintiffs' Second Amended Complaint (Docket Entry No. 27), and Rule 12(b)(6) Motion to Dismiss Plaintiffs' Second Amended Complaint by Defendants Charles A. McClelland, Jr., William Rutherford, Candice Vaughn, Jillian McGowan, Maria Hernandez, Sean Hunter, Jorge Herrera and Walter Gaw (Docket Entry No. 28). For the reasons set forth below, the pending motions to dismiss will be granted in part and denied in part, and limited discovery will be allowed against the individual officer defendants for purposes of determining their entitlement to qualified immunity.

## I.  Standard of Review

The individual defendants seek dismissal of all the claims asserted against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted. The City of Houston seeks dismissal under Rule 12(b)(6) of the federal law claims asserted against it for ratifying the allegedly unconstitutional conduct of the individual officer defendants, and of the federal law claims asserted by Debra and Michael Khansari for "individual and bystander liability," and seeks dismissal of the claims asserted under the TTCA for lack of subject matter jurisdiction under Rule 12(b)(1).

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

P. 8(a)(2).  A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom Cloud v. United States, 122 S. Ct. 2665 (2002).  The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor.  Id.  To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 127 S. Ct. at 1965).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief."  Id. (quoting Twombly, 127 S. Ct. at 1966). Moreover, the court does not accept as true legal conclusions: "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." Id. at 1950.

Rule 12(b)(1) challenges to subject matter jurisdiction come in two forms: "facial" attacks and "factual" attacks. See Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981). A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings. Id. A factual attack challenges the existence of subject matter jurisdiction in fact -- irrespective of the pleadings -- and matters outside the pleadings, such as testimony and affidavits, are considered. Id. Because the City of Houston has not submitted evidence in support of its Rule 12(b)(1) motion to dismiss the TTCA claims asserted against it, the motion is a facial attack on plaintiffs' pleadings, and the court's review is limited to whether the complaint sufficiently alleges jurisdiction.

## II.  **Plaintiffs' Factual Allegations**

Plaintiffs allege that when the incidents at issue occurred Corey was a 19-year old suffering from severe anxiety caused by allergies. Corey's doctors had prescribed several anxiety medications. Despite taking these drugs according to his doctor's instructions, the drugs had a negative effect on Corey, causing thoughts of suicide and depression, and causing him to sleep for long periods of time.

-4-

20.  On November 25, 2011, Corey slept most of the day.
When he awoke in the late afternoon, Mrs. Khansari saw
him mumble strangely to himself and then saw him take a
large number of medication pills.    This caused
Mrs. Khansari to fear that Corey had attempted suicide
and that his life was in jeopardy.   Alarmed, she told
Mr. Khansari immediately, who then called 9-1-1.

21.  Shortly after Mr. Khansari called 9-1-1, an
ambulance arrived at the Khansari home.    One of the
paramedics approached Corey, and Corey emphatically
informed him that he did not wish to go with them in the
ambulance.   The paramedic informed Mrs. Khansari that
they would be calling for another ambulance for back-up.

22.  Shortly afterwards, Mrs. Khansari was in the front
yard of their home when, to her surprise, a Houston
Police Department patrol car arrived.   A female officer
believed to be Officer Vaughn came out of her squad car
armed with a long gun and appeared to put a round in the
chamber as if preparing to fire.   Mrs. Khansari asked the
officer, "What are you doing?"   Officer Vaughn replied "I
might have to kill someone" or words to that effect.
Mrs. Khansari was upset by this statement and explained
to Officer Vaughn that Corey had taken lots of medication
pills and needed his stomach pumped.    Mrs. Khansari
repeated that there was no need for Officer Vaughn to be
using a gun as no one at the Khansari home was armed and
as there were no guns at the Khansari home.

23.  Within the next few moments, additional Officers
arrived at the scene, and several of the them were also
armed with long guns.    Armed Officers yelled at
Mr. Khansari in a threatening manner to get out of the
way, that he was interfering with police work, and that
if he did not get out of the way, he would be arrested.
Mr. Khansari then complied.

24.  At some point, Corey had walked out of the front
door of the Khansari home and was standing in the yard
near the front door.   The Officers pointed their weapons
at Corey.   Red laser beam dots appeared on Corey, which
terribly frightened Corey and his mother.   They feared
that the Officers were going to shoot Corey.

25.  At that point, Mrs. Khansari, trying to protect
Corey from the armed Officers, interposed herself between
certain Officers, including, upon information and belief,

-5-

Officer Rutherford, and Corey, repeating that their weapons were unnecessary and that the Khansaris were unarmed.  At this time, red laser beam dots appeared on Mrs. Khansari.  Officers were shouting.  Fearing that his mother was in danger of being shot or of having a heart attack, Corey pushed Mrs. Khansari out of the line of fire.  Immediately, Officer Rutherford and/or other Officers used a taser in such a manner as to strike Corey in the face and on his head.  One of the taser darts pierced Corey's eye.

26.  After being shot with the taser and receiving incapacitating electricity, Corey fell to his knees and was severely disoriented.  After a few seconds, Corey tried to get up and was shot several more times with a taser in the torso and legs.  Seeing this, Mr. Khansari felt extreme anxiety and fell to the ground, feeling like he was having a heart attack.  Paramedics rushed to Mr. Khansari and took him into the ambulance.[1]

Plaintiffs allege that after being tasered, Corey retreated to his house where he pulled the taser dart from his eye. Mrs. Khansari called Corey on the phone; a police officer refused to speak with Corey but a fireman took the phone and Corey told the fireman that he would come out of the house with his hands over his head.  Plaintiffs allege that when Corey exited the house, a police officer kicked Corey to the ground.[2]  Corey was taken to St. Joseph Hospital for treatment.[3]  Plaintiffs allege that

[a]s a result of the taser shot to his eye, Corey suffered and continues to suffer from severe and permanent damage to his optical nerve and retina, losing

---

[1]Plaintiffs Corey Khansari, Debra Khansari, and Michael Khansari's Second Amended Complaint ("Plaintiffs' Second Amended Complaint"), Docket Entry No. 20, pp. 5-7 ¶¶ 20-26.

[2]Id. at 7-8 ¶ 27.

[3]Id. at 8 ¶ 28.

-6-

vision in his right eye.  As a result of Defendants'
acts, Corey has undergone six surgical procedures for the
injuries to his right eye, and his medical treatment is
ongoing.  Corey feels frequent severe nerve pain on the
right side of his face and head that prevents him from
doing many things he used to do and that has
significantly impacted his life for the worse.[4]

Plaintiffs allege that

[a]t no time on November 25, 2011[,] did Corey have a
weapon; all he had was his epinephrine pen and cell
phone.  At no time on that day did he give anyone any
reasonable belief or suspicion that he had a weapon or
could obtain a weapon.  On that day, Corey made no
threats to harm or endanger any []other person, including
the Officers.  Corey was never arrested or charged with
or even suspected of having committed any crime.[5]

Plaintiffs allege that defendants were at all times acting

under color of laws of the State of Texas and the City of Houston.[6]

### III.  <u>Motion to Dismiss Chief McClelland and the Individual Officer Defendants</u>

Plaintiffs allege that intentional actions of the individual

police officer defendants make them liable under 42 U.S.C. § 1983

for infringing plaintiffs' rights to be free from excessive force

in violation of the Fourth Amendment either by using excessive

force or failing to prevent the use of excessive force.[7]

---

[4]<u>Id.</u>

[5]<u>Id.</u> at 8 ¶ 29.

[6]<u>Id.</u> ¶ 30.

[7]<u>Id.</u> at 9-11 ("Excessive Force Claims against the Officers in
their Individual Capacities"), and 11-12 ("Mr. & Mrs. Khansari's
Individual and Bystander Injury Claims").

Plaintiffs allege that Chief McClelland is liable under 42 U.S.C. § 1983 for failing to train and supervise the individual officer defendants and for ratifying their allegedly unconstitutional conduct.[8]  Chief McClelland and the individual officer defendants seek dismissal of all claims asserted against them.[9]

**A.   Personal Capacity Claims for Excessive Use of Force Asserted Against the Individual Officer Defendants**

    1.   <u>Applicable Law</u>

        (a)   42 U.S.C. § 1983

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States.  A complaint under § 1983 must allege that the acts complained of occurred under color of state law and that the complaining parties were deprived of rights guaranteed by the Constitution or laws of the United States. <u>Parratt v. Taylor</u>, 101 S. Ct. 1908, 1913 (1981), <u>overruled on other grounds</u>, <u>Daniels v. Williams</u>, 106 S. Ct. 662 (1986); <u>Piotrowski v. City of Houston</u>, 51 F.3d 512, 515 (5th Cir. 1995).  A complaint under § 1983 must also allege that the constitutional or statutory

---

    [8]<u>Id.</u> at 12-17 ("The City's Failure to Train and/or Supervise the Officers"), 17-21 ("The City's Unlawful Policy and Custom"), 21-24 ("The City's Ratification").

    [9]Rule 12(b)(6) Motion to Dismiss Plaintiffs' Second Amended Complaint by Defendants Charles A. McClelland, Jr., William Rutherford, Candice Vaughn, Jillian McGowan, Maria Hernandez, Sean Hunter, Jorge Herrera and Walter Gaw ("Motion to Dismiss Claims Against Individual Defendants"), Docket Entry No. 28.

deprivation was intentional or due to deliberate indifference and not the result of mere negligence.  Farmer v. Brennan, 114 S. Ct. 1970 (1994).  Plaintiffs suing public officials under § 1983 must file short and plain complaints that must be factual and not conclusive.  Schultea v. Wood, 47 F.3d 1427, 1433 (5th Cir. 1995)(en banc).

     (b)   Official and Personal Liability

     Public officials like the individual officer defendants and Chief McClelland may be sued pursuant to 42 U.S.C. § 1983 in either their official and/or their personal capacities.  Hafer v. Melo, 112 S. Ct. 358, 361-63 (1991) (citing Kentucky v. Graham, 105 S. Ct. 3099 (1985)).

> [T]he distinction between official-capacity suits and
> personal-capacity suits is more than "a mere pleading
> device." . . . State officers sued for damages in their
> official capacity are not "persons" for purposes of the
> suit because they assume the identity of the government
> that employs them. . . . By contrast, officers sued in
> their personal capacity come to court as individuals.  A
> government official in the role of personal-capacity
> defendant thus fits comfortably within the statutory term
> "person."

Id. at 362.  The real party in interest in an official-capacity suit is the governmental entity, not the named official.  Id. at 361 (citing Graham, 105 S. Ct. at 3105) ("Suits against state officials in their official capacity . . . should be treated as suits against the State.").  See Bennett v. Pippin, 74 F.3d 578, 584 (5th Cir.), cert. denied, 117 S. Ct. 68 (1996) ("When Mrs. Bennett sued the Sheriff in his individual and official

capacity, she sued two defendants:  the Sheriff and the County.").
See also Turner v. Houma Municipal Fire and Police Civil Service
Board, 229 F.3d 478, 483 (5th Cir. 2000) ("Official-capacity suits
. . . 'generally represent only another way of pleading an action
against an entity of which an officer is an agent.' . . .
Accordingly, a § 1983 suit naming defendants in only their
'official capacity' does not involve personal liability to the
individual defendant.") (citations omitted).  To state a personal-
capacity claim under § 1983 plaintiffs must allege that while
acting under color of state law defendants were personally involved
in the deprivation of a right secured by the laws or Constitution
of the United States, or that defendants' wrongful actions were
causally connected to such a deprivation.  James v. Texas Collin
County, 535 F.3d 365, 373 (5th Cir. 2008).  Absent personal
involvement or notice, supervisors cannot be held liable for
subordinates' actions.  Id. (citing Doe v. Taylor Independent
School District, 15 F.3d 443, 454 (5th Cir. 1994) (en banc)).

> (c)  Qualified Immunity

Public officials sued in their individual capacities under
§ 1983 are shielded from suit by the doctrine of qualified
immunity. Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001), overruled
in part by Pearson v. Callahan, 129 S. Ct. 808, 812 (2009).
"Qualified immunity is 'an entitlement not to stand trial or face
the other burdens of litigation,' . . . it is effectively lost if

a case is erroneously permitted to go to trial." Id. (quoting
Mitchell v. Forsyth, 105 S. Ct. 2806, 2815 (1985)).  The doctrine
of qualified immunity was created to balance the interest of
compensating persons whose federally protected rights have been
violated against the fear that personal liability might inhibit
public officials in the discharge of their duties.  See Johnston v.
City of Houston, Texas, 14 F.3d 1056, 1059 (5th Cir. 1994).  The
qualified immunity analysis involves a two-step inquiry:
(1) whether the plaintiff has alleged a violation of a
constitutional right; and (2) whether that right was clearly
established at the time of the alleged misconduct.  Pearson, 129
S. Ct. at 815-16 (citing Saucier, 121 S. Ct. at 2155).  It is
within the discretion of the district court to decide which of the
two steps to address first.  Id. at 818.  Courts examine each
officer's actions independently to determine whether he or she is
entitled to qualified immunity.  Newman v. Guedry, 703 F.3d 757,
762 (5th Cir. 2012), cert. denied, 134 S. Ct. 162 (2013) (citing
Meadours v. Ermel, 483 F.3d 417, 421-22 (5th Cir. 2007)).  Once a
defendant asserts qualified immunity, the burden shifts to the
plaintiffs, who bear the burden of negating the defense of
qualified immunity.  See Newman, 703 F.3d at 761.

(d)  Elements of Claims for Excessive Use of Force

To state a claim for the use of excessive force under the
Fourth Amendment, plaintiffs must first allege facts capable of

-11-

showing that they suffered a seizure.   See Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004) (citing Graham, 109 S. Ct. at 1871).   Plaintiffs must then allege facts capable of showing that they suffered (1) an injury; (2) which resulted directly and only from a use of force that was clearly excessive to the need; and (3) the excessiveness of which was objectively unreasonable.   Id.   See also Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996).   "[T]he question [is] whether the totality of the circumstances justified" that use of force.   Tennessee v. Garner, 105 S. Ct. 1694, 1700 (1985).   In Graham, 109 S. Ct. at 1865, the Supreme Court articulated three guideposts for courts to use when determining if a particular use of force was reasonable under the circumstances or excessive to the need.   These guideposts — often referred to as the Graham factors — are:   (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene.   Id. at 1872.   The Graham factors provide the framework for judging whether an officer's use of force was excessive. Newman, 703 F.3d at 761.

To state a claim under § 1983 for an officer's failure to prevent another officer's use of excessive force, plaintiffs must allege that (1) the bystanding officer knew that a fellow officer was violating an individual's constitutional rights, (2) had a reasonable opportunity to prevent violation, and (3) chose not to

act.  Whitley v. Hanna, 726 F.3d 631, 646 (5th Cir. 2013), pet. for cert. filed, 82 U.S.L.W. (December 5, 2012) (citing Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995)).  Such liability is premised on the theory that by choosing not to intervene, a bystanding officer participates in his fellow officer's acts.  Id.

### 2.  Application of the Law to the Alleged Facts

Plaintiffs allege

31.  The Officers violated Corey's constitutional right to be free from unreasonable seizure of his person when they used objectively unreasonable force in restraining Corey's liberty, causing him severe personal injuries. The Officers violated Corey's rights to life and the integrity of his person.  The Fourth Amendment of the United States Constitution fully protects these rights.

32.  Many of the Officers' acts were objectively unreasonable.  First, the Officers failed to obtain necessary information relating to the circumstances before planning and coordinating their approach and encounter with the Khansaris at their home. Alternatively, the Officers disregarded the important information they did obtain about the circumstances before planning and coordinating their approach and encounter.

33.  Second, once the Officers had begun their approach and encounter with the Khansaris, they failed to observe additional circumstances that should have informed them that their approach carrying high powered guns was unnecessary, counterproductive, and dangerous.  An objective bystander would have observed that Corey was unarmed and failed to present any real threat to himself or those surrounding him, including the Officers.

34.  Third, once in Corey's proximity, the Officers failed to properly deal with Corey, who they knew to be suffering from a state of mental illness and/or mental or emotional instability.  The Officers failed to gauge their conduct accordingly so as to deescalate the situation in light of Corey's known mental instability. Instead, the Officers conducted themselves in a manner

that dangerously escalated the situation.  For example, the Officers pointed their long rifles and guns at Mrs. Khansari and at Corey, who could see the red laser beam dots on each other, causing them to fear for their lives.  This conduct by the Officers created a situation so escalated that Mrs. Khansari had to try to protect her son from being shot and Corey had to push his mother aside to save her from being shot of having a heart attack.

35.  Fourth, Officer Rutherford's and potentially other Officers' use of excessive force did not relate to a proper or conscious assessment of danger; they failed to respond to Corey's behavior proportionately.  Officer Rutherford's and potentially other Officers' choices were objectively unreasonable under the circumstances and unconstitutional.  The use of such force as was used against Corey, an unarmed and emotionally disturbed teenager, under these circumstances was objectively unreasonable and unconstitutional.  The number of tasers deployed and the manner in which they were deployed was excessive to the circumstances and unnecessary. Further, tasers should never be aimed at or deployed toward a person's head.  Yet Officer Rutherford and/or another Officer deployed a taser that landed at []or near Corey's eye, causing him severe personal injury.

36.  Finally, the other Officers present at the scene, seeing that Officer Rutherford and other Officers were using unreasonable and excessive force, failed to take reasonable steps to stop their fellow Officers from using excessive force and/or failed to take reasonable steps to intervene and protect Plaintiffs from such excessive force.  Instead, these witnessing Officers, having reasonable opportunities to realize the excessive nature of the force and having realistic and reasonable opportunities to stop such excessive force, stood by and watched as Officer Rutherford and other Officers engaged in excessive force against Plaintiffs through several acts, including but not limited to, pointing their guns at Mrs. Khansari and at Corey, making threats to kill, shooting Corey with a taser in the eye, shooting Corey several more times with a taser, and kicking Corey to the ground after he had come out from inside his home.  Such witnessing Officers are liable for their nonfeasance.[10]

---

[10]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, pp. 9-11 ¶¶ 31-36.

(a)   Facts Alleged Are Sufficient to State a Claim
Arising from Force Used Against Corey Khansari

Defendants argue that plaintiffs' claims for use of excessive force against Corey arising from the drawing and pointing of weapons and kicking him to the ground are subject to dismissal either because the force used was not excessive or because the officers are entitled to qualified immunity.  Defendants argue that

> [a]ccepting Plaintiffs' own allegations as true, no clearly established Fourth Amendment right would have been violated by an officer using some amount of force to take Corey safely into custody — i.e., taking him to the ground — given the circumstances that preceded his exit from the home.[11]

Defendants argue that

> Plaintiffs make absolutely no attempt in their Second Amended Complaint to identify the **one** officer who allegedly kicked Corey to the ground.   All three Plaintiffs purport to have been present during the incident.   In addition, Plaintiffs have positively identified two of the officers who first arrived at the scene — Officer Vaughn, a female officer, and Officer Rutherford, a male officer.  The other officers they have sued include two female officers, two male officers, and one sergeant.  They make no attempt to identify whether the officer they allege kicked Corey was officer Vaughan or Rutherford, or even whether it was a male or female officer.[12]

Asserting that the only force alleged to have been used against Corey was tasering four or five times and kicking once, defendants argue that even if these acts constituted excessive force, defendants are entitled to dismissal of plaintiffs' claims for

---

[11]Motion to Dismiss Claims Against Individual Defendants, Docket Entry No. 28, at 10.

[12]Id. at 11.

failure to prevent these uses of force because neither an officer's decision to fire his taser nor an officer's decision to kick Corey could reasonably have been anticipated or prevented by other officers at the scene.[13]  Defendants also argue that "[t]he alleged failures of the officers to properly plan, evaluate or gauge the situation do not state a recognized cause of action for a constitutional violation under the Fourth Amendment,"[14] and that "[p]laintiffs' approach of suing every officer who responded to the scene is insufficient to state viable claims against the individual police officers" entitled to qualified immunity.[15]

Acknowledging however that plaintiffs' allegations that Corey was unnecessarily tasered multiple times could potentially state a claim for excessive use of force in violation of the Fourth Amendment, defendants argue that these excessive force claims are nevertheless subject to dismissal on the basis of qualified immunity because a constitutional right to be free from such force was not clearly established in November of 2011 when the incident at issue occurred.   Defendants argue that

> [p]laintiffs' own allegations establish a factual
> scenario that fails to satisfy the second prong as to
> Officer Rutherford's deployment of the taser. Plaintiffs
> allege that Corey was mentally unstable, contemplating
> suicide, and pushed his mother in the middle of a tense
> and chaotic scene, which resulted in his tasing.  Under

---

[13]Id. at 13.

[14]Id. at 12.

[15]Id. at 13.

the facts alleged by Plaintiffs, they cannot establish that no reasonable officer under the same circumstances could have believed it was constitutional to deploy his taser. . . Thus the excessive force claim against Officer Rutherford should be dismissed under the second prong of qualified immunity.[16]

Plaintiffs respond that their allegations are sufficient to state a claim against the individual officers for excessive use of force against Corey because they have alleged that Corey suffered an injury that is more than de minimus since it resulted in loss of vision in one eye, and have alleged that the officers' use of force was clearly and unreasonably excessive.[17]

In Ikerd, 101 F.3d at 434, the court stated that in analyzing the first and second elements required to state a claim for the excessive use of force, i.e., that plaintiff suffered an injury that resulted directly and only from a use of force that was clearly excessive to the need, "the extent of the injury suffered by a plaintiff is one factor that may suggest whether the use of force was excessive in a particular situation."  In analyzing the third element, i.e., "the excessiveness of force was [] objectively unreasonable," the court reasoned that "[i]n gauging the objective reasonableness of the force used by a law enforcement officer,

---

[16]Id. at 14.

[17]Plaintiffs Corey Khansari, Debra Khansari, and Michael Khansari's Response to Rule 12(b)(6) Motion to Dismiss Plaintiffs' Second Amended Complaint by Defendants Charles A. McClelland, Jr., William Rutherford, Candice Vaughan, Jillian McGowan, Maria Hernandez, Sean Hunter, Jorge Herrera and Walter Gaw ("Plaintiffs' Response to Individual Defendants' Motion to Dismiss"), Docket Entry No. 31, pp. 5-9.

[courts] must balance the amount of force used against the need for that force." Id.

Although plaintiffs have not alleged any facts capable of establishing that Corey suffered injury as a result of merely having weapons pointed at him or being kicked to the ground while exiting the house, according to Plaintiffs' Second Amended Complaint, the individual officers who responded to the call for assistance at the Khansari's home on November 25, 2011, encountered a mentally ill or emotionally disturbed young man who had refused medical services but was not suspected of having committed any crime, was not armed, and did not pose an immediate threat to the officers or to others. Nevertheless, without attempting to use physical skill, negotiation, or even commands, the officers immediately deployed their tasers. Plaintiffs allege that even after a taser dart hit Corey in the eye and caused him to fall to the ground, one or more officers continued to fire tasers until Corey managed to retreat into his house. Plaintiffs' allegations that Corey suffered loss of vision in one eye as a result of being tasered while standing in his yard after having refused medical help are sufficient to satisfy the requirements that plaintiff plead facts capable of establishing that Corey suffered an injury, i.e., loss of vision in one eye, which resulted directly and only from a use of force, i.e., being tasered, that was excessive to the need, i.e., the need to provide medical assistance to Corey.

-18-

Because plaintiffs also allege that the officers fired their tasers at Corey even though Corey posed no immediate threat to the officers or to others, the plaintiffs' allegations of fact are also sufficient to satisfy the requirement that plaintiffs plead facts capable of establishing that the excessiveness of the force was objectively unreasonable.  Since, moreover, plain-tiffs allege that the defendant officers each had an opportunity upon arrival at the scene and upon observing the drawing of tasers to stop the excessive force and prevent the harm to Corey, but chose not to act, plaintiffs' allegations are also sufficient to state a claim for failure to prevent the use of excessive force.

Plaintiffs' allegations that the defendant officers failed to properly plan, evaluate, or gauge the situation are not sufficient to state a claim for violation of rights protected by the Fourth Amendment because these alleged failures neither constitute a seizure, nor a use of force that caused Corey to suffer an injury that was excessive to the need or objectively unreasonable.

### (1) Facts Alleged Are Sufficient to Overcome Defense of Qualified Immunity for Claims Arising from Force Used Against Corey Khansari

Without citing any authority, defendants contend that they are entitled to qualified immunity because in November of 2011 the law was not sufficiently clear that a reasonable officer would have known that tasering Corey multiple times would have violated the constitution.  In other words, the defendant officers argue that

their conduct was not objectively unreasonable in light of clearly established law.  In Saucier, 121 S. Ct. at 2155, the Supreme Court mandated a two-step procedure for resolving government officials' qualified immunity claims.  First, courts must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right.  Second, if plaintiffs satisfy the first step, courts must decide whether the right at issue was "clearly established" at the time of defendants' alleged misconduct.  Id. Since the defendants assume, arguendo, for purposes of the qualified immunity analysis, that the plaintiffs' allegations that the defendant officers unnecessarily tasered Corey are capable of establishing a violation of Corey's Fourth Amendment rights, the court turns directly to the second analytical step of the qualified immunity analysis:  whether that right was clearly established when the actions at issue occurred.

A right is clearly established where "'[t]he contours of [that] right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Saucier, 121 S. Ct. at 2156 (quoting Anderson v. Creighton, 107 S. Ct. 3034, 3039 (1987)).  The Fifth Circuit has observed that

> [a]llegations that an officer used excessive force in
> conducting a seizure complicates the Saucier inquiry.
> This complexity stems from having to make two
> "overlapping objective reasonableness inquir[ies]." . . .
> We must first answer the constitutional violation
> question by determining whether the officer's conduct met
> the Fourth Amendment's reasonableness requirement. . . If
> we find that the officer's conduct was not reasonable

under the Fourth Amendment, we must then answer the qualified immunity question by determining whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, we must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable. Despite any seeming similarity between these two questions, they are distinct inquiries under Saucier, and we must conduct them both.

Lytle v. Bexar County, Texas, 560 F.3d 404, 410 (5th Cir. 2009), cert. denied, 130 S. Ct. 1986 (2010). Courts do not judge the reasonableness of the officers' use of force from the safety of their chambers or "with 20/20 vision of hindsight" but, instead, "from the perspective of a reasonable officer on the scene." Newman, 703 F.3d at 762 (quoting Graham v. Connor, 109 S. Ct. 1865, 1872 (1989)). The court's inquiry is "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. (quoting Graham, 109 S. Ct. at 1872).

Plaintiffs argue that

[i]n 2011, when Corey Khansari's injuries occurred, it was clearly established that excessive force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. Bazan v. Hidalgo Cnty., 246 F.3d 481, 488 (5th Cir. 2001) (quoting Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The threat of physical harm must be immediate. Garner, 471 U.S. at 11. Accepting the complaint's well-pleaded facts as true and viewing them in the light most favorable to the Khansaris, Corey did not pose an immediate threat to the officers or to others. The Khansaris' pleadings sufficiently allege that the Officers' use of force was objectively

-21-

unreasonable in light of clearly established law so as to overcome qualified immunity defense at this stage.[18]

There is no dispute that the overarching right to be free from excessive force was clearly established when the defendants' interaction with Corey occurred.   However, as the plaintiffs recognize, the general definition of a right is not sufficient to resolve the question of qualified immunity.   Citing <u>Banks v. Gammon</u>, 2010 WL 996743, at *5 (N.D. Tex. January 26, 2010), plaintiffs acknowledge that

> [f]or the purposes of the qualified immunity analysis, "'clearly established' means that the 'contours of the right' are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" . . . The law generally should be established in a more particularized sense, because the primary concern is fair notice to the officer in the specific context in which he is acting. . . When qualified immunity is raised in a motion to dismiss, it is the defendant's conduct as outlined in the pleadings that is examined for objective reasonableness.[19]

"Thus, while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." <u>Lytle</u>, 560 F.3d at 417 (quoting <u>Bush v. Strain</u>, 513 F.3d 492, 502 (5th Cir. 2008)). Although neither the plaintiffs nor the defendants have cited any case with facts similar to this one, the Fifth Circuit recently rejected arguments similar to those on which the defendants rely in

---

[18]<u>Id.</u> at 13.

[19]<u>Id.</u> (citations omitted).

a case involving the use of tasers during an investigatory traffic stop.  See Newman, 703 F.3d at 757.

In Newman, 703 F.3d at 757, the Fifth Circuit considered an excessive force claim against an officer who had repeatedly tasered the plaintiff after the plaintiff had made an off-color joke during an investigatory stop that occurred in 2007.  The officer argued that he had no reasonable warning that tasering a suspect multiple times was a constitutional violation because "there was then no binding caselaw on the appropriate use of tasers."  Id. at 763. The Fifth Circuit agreed that in 2007 there was no binding caselaw on the appropriate use of tasers.  But the Fifth Circuit nonetheless rejected the officer's contention that he had no reasonable warning that tasering an individual multiple times could violate constitutional rights.  Explaining that "[l]awfulness of force . . . does not depend on the precise instrument used to apply it," and that "[q]ualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel," id. at 763-64, the Fifth Circuit looked to the Graham factors and held that none of those factors justified the officer's tasering of the plaintiff in that case.  Id. at 764. See Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004) ("in an obvious case," the Graham excessive-force factors themselves "can 'clearly establish' the answer, even without a body of relevant case law").

As the Fifth Circuit did in Newman, this court looks to the three Graham factors as guideposts for determining whether

plaintiffs' allegations against the individual officer defendants are sufficient to overcome their assertions of qualified immunity: (1) the severity of the crime at issue, (2) whether the plaintiff posed an immediate threat to the safety of the officers or others, and (3) whether the plaintiff was actively resisting arrest or attempting to flee the scene. See Graham, 109 S. Ct. at 1872. As explained in the preceding section, according to the facts alleged in Plaintiffs' Second Amended Complaint, Corey committed no crime, posed no immediate threat to anyone's safety, had resisted medical treatment, but was not resisting arrest or attempting to flee. Taking the facts alleged in the light most favorable to plaintiffs, the court concludes that plaintiffs have alleged facts capable of establishing that the tasering of Corey was objectively unreasonable in light of clearly established law when the incident occurred. See Autin v. City of Baytown, Tex., 174 F. App'x 183, 186 (5th Cir. 2005) (per curiam) (without support of the Graham factors, nothing "would have indicated to a reasonable officer that repeatedly tasing a woman while forcing her to the ground was lawful conduct"); Massey v. Wharton, 477 F. App'x 256, 263 (5th Cir. 2012) (per curiam) (without support of the Graham factors, no reasonable officer would have believed use of taser twice and pepper spray once to be reasonable); Anderson v. McCaleb, 480 F. App'x 768, 773 (5th Cir. 2012) (per curiam) (deciding that based on the Graham factors, the officer "should have known that he could

not continue to shock [the suspect] with the taser after he was no longer resisting arrest").

> **(2)  Limited Discovery Is Required to Resolve Defendants' Entitlement to Qualified Immunity for Claims Arising from Force Used Against Corey Khansari**

Asserting that "[p]laintiffs' approach of suing every officer who responded to the scene is insufficient to state viable claims against individual officers entitled to qualified immunity,"[20] defendants argue that the plaintiffs' allegations of fact are insufficient to state an excessive use of force claim against any of them except, perhaps, Officer Rutherford, because he is the only officer who plaintiffs have alleged deployed his taser against Corey.  Plaintiffs respond that

> [d]efendants complain that Plaintiffs cannot accurately identify who kicked Corey to the ground or engaged in other specific acts other than the tasing and the pointing of weapons with verbal threats.  In fact, the reason that Plaintiffs cannot identify specifically who engaged in which acts is that Defendants have not yet provided investigation materials that would shed some light on these issues.  The only reason that Plaintiffs can identify who pointed a weapon and who tased Corey is that the Defendants have recently provided a copy of the statements of some of the Officers that describe those two events.[21]

To state a § 1983 personal-capacity claim against the officer defendants, plaintiffs must allege facts capable of establishing

---

[20]Motion to Dismiss Claims Against Individual Defendants, Docket Entry No. 28, p. 13.

[21]Plaintiffs' Response to Individual Defendants' Motion to Dismiss, Docket Entry No. 31, pp. 8-9.

that while acting under color of state law, the officers were
either personally involved in the deprivation of Corey Khansari's
Fourth Amendment right to be free from the excessive use of force,
or that their wrongful actions were causally connected to that
deprivation. James, 535 F.3d at 373. Nevertheless, defendants'
contention that the plaintiffs' allegations of fact are
insufficient to survive their Rule 12(b)(6) motion to dismiss all
of the officers except, perhaps, Officer Rutherford, who plaintiffs
allege tasered Corey, take the principle requiring plaintiffs to
identify individual conduct attributable to each officer too far.
At this early stage of a case, successful Rule 12(b)(6) motions
based on plaintiffs' failure to plead their claims with factual
specificity are typically directed at claims asserted against
policymakers who are named as defendants absent any allegation
about their specific role in formulating or implementing a
challenged policy. See, e.g., § III.B.2, below, addressing the
plaintiffs' claims asserted against Chief McClelland. Here,
however, the court is not dealing with allegations against
policymakers. At issue are allegations that a number of individual
officers had direct involvement in using or failing to prevent the
use of excessive force against plaintiff Corey Khansari.

For the reasons explained in the preceding two sections the
court has already concluded that plaintiffs' factual allegations
that Corey suffered extensive injuries from having been tasered are
not only sufficient to satisfy the requirements for pleading a

claim for the excessive use of force against the officers who tasered him but, if true, are also sufficient to overcome those officers' assertions of qualified immunity.  While defendants correctly argue that the plaintiffs' allegations lack factual specificity needed to deny their assertions of qualified immunity, lack of such factual specificity at this stage of the case does not provide a basis on which to grant or deny defendants' motion to dismiss for failure to state a claim.  See Huff v. Refugio County Sheriff's Department, 2013 WL 5574901, *2 (S.D. Tex. October 9, 2013) (Costa, J.).

The Fifth Circuit has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense.  See Backe v. LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012) (citing Wicks v. Mississippi State Employment Services, 41 F.3d 991, 994-95 (5th Cir.), cert. denied, 115 S. Ct. 2555 (1995)).  As explained in Backe, once a district court has found that, if true, plaintiffs' factual allegations are sufficient to overcome defendants' assertions to qualified immunity, "if the court remains 'unable to rule on the immunity defense without further clarification of the facts,' it may issue a discovery order 'narrowly tailored to uncover only those facts needed to rule on the immunity claim.'"  Id. (citing Lion Boulos v. Wilson, 834 F.2d 504, 507-08 (5th Cir. 1987)).

Here, plaintiffs allege that

25.  . . . Officer Rutherford and/or other male Officers used a taser in such a manner as to strike Corey in the face and on his head.  One of the taser darts pierced Corey's eye.

26.  After being shot with the taser and receiving incapacitating electricity, Corey fell to his knees and was severely disoriented.  After a few seconds, Corey tried to get up and was shot several more times with a taser in the torso and legs.[22]

Absent further clarification of the facts to show which, if any, officers other than Officer Rutherford deployed their tasers against Corey, or which, if any, of the other officers had an opportunity to prevent, but chose not to prevent, the use of excessive force against Corey Khansari, the court is not able to rule on the defendant officers' assertions of qualified immunity to the plaintiffs' claims for the use or failure to prevent the use of excessive force against Corey.  Limited discovery will be able to flesh out the remaining details of which officer or officers tasered Corey or wrongfully failed to prevent their fellow officers from tasering Corey.  See Bias v. Lundy, 188 F. App'x 248, 249-50 (5th Cir. 2006) (vacating judgment as a matter of law granting qualified immunity as to two officers who were alleged to have attacked the plaintiff, but affirming as to four officers about whom plaintiff presented no evidence showing their involvement).

Since the court has concluded that plaintiffs' pleadings are adequate to at least potentially state a claim, discovery may

---

[22]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, pp. 6-7 ¶¶ 25-26.

proceed on the limited issue of which of the individual officers tasered Corey and whether those officers are entitled to qualified immunity. The court has not concluded that plaintiffs will eventually be able to establish a violation of Corey's Fourth Amendment rights, but only that the pleadings are sufficient to create that possibility. Should discovery lead to the conclusion that there is no genuine issue of fact that could support such a claim, there will be no procedural or substantive barrier to the filing of a motion for summary judgment on the issue of qualified immunity. Accordingly, the motion to dismiss the claims asserted against the individual officer defendants arising from force used against Corey Khansari will be denied.

(b)   Facts Alleged Are Not Sufficient to State § 1983 Claims Arising from Force Used Against or Witnessed by Corey's Parents, Debra and Michael Khansari

Plaintiffs allege

37. Mrs. Khansari is Corey's mother. She was witness to the entire terrifying event, which began with the female Officer, believed to have been Officer Vaughn, first arrived wielding a long gun. Mrs. Khansari was herself a subject of the Officers' conduct, being pointed at with guns, being grabbed by the neck or shoulder, and being told threatening statements. The Officers completely disregarded her multiple attempts at explaining Corey's state. She was within feet of her son when he was shot by taser guns. She observed that he was shot in the face and later that he had pulled a taser hook out of his eye. She suffered shock as a result of the direct emotional impact upon her from the Officers actions directed specifically at her and from her contemporaneous observance of the events.

38. Mr. Khansari is Corey's father and was also himself a subject of the Officers' actions. In a threatening

manner, the Officers yelled at Mr. Khansari to get away, that he was interfering with police work, and threatened that if he did not get away, they would arrest him. He complied. Later, after seeing Mrs. Khansari trying to protect Corey, Corey trying to protect his mother, and Corey getting shot with the taser guns, Mr. Khansari felt extreme anxiety and like he was having a heart attack. He fell to the ground and paramedics rushed to him and placed him in the ambulance. He suffered shock as a result of the direct emotional impact upon him from the Officers actions that were directed at him and from his contemporaneous observance of the events.

39. Mr. and Mrs. Khansari have suffered and continue to suffer extreme emotional distress as a result of the conduct of the Defendants and are entitled to mental anguish damages in the past and future.[23]

Plaintiffs' claims for excessive use of force asserted against the individual officers arising from drawing and pointing weapons and shouting at Mr. and Mrs. Khansari are subject to dismissal for failure to state a claim because plaintiffs have not alleged facts capable of showing that the police actions were directed at Mr. or Mrs. Khansari or that Mr. and Mrs. Khansari suffered a seizure as required for a violation of rights protected by the Fourth Amendment. Instead, plaintiffs allege that

23. . . . Armed Officers yelled at Mr. Khansari in a threatening manner to get out of the way, that he was interfering with police work, and that if he did not get out of the way, he would be arrested. Mr. Khansari then complied.

24. At some point, Corey had walked out of the front door of the Khansari home and was standing in the yard near the front door. The Officers pointed their weapons at Corey. They feared that the Officers were going to shoot Corey.

---

[23]*Id.* at 11-12 ¶¶ 37-39.

25.   At that point, Mrs. Khansari, trying to protect Corey from the armed Officers, interposed herself between certain Officers, including, upon information and belief, Officer Rutherford, and Corey, repeating that their weapons were unnecessary and that the Khansaris were unarmed.[24]

Nor have plaintiffs alleged facts capable of establishing that either Mr. or Mrs. Khansari suffered an injury that was more than de minimis due to any of the acts about which they complain. Instead, plaintiffs merely allege that "Mr. and Mrs. Khansari have suffered and continue to suffer extreme emotional distress as a result of the conduct of the Defendants."[25]   Plaintiffs allege no facts capable of establishing that either Mr. or Mrs. Khansari suffered physical injuries from police actions directed at them and not at Corey.   Nevertheless, citing Petta v. Rivera, 143 F.3d 895, 900-01 (5th Cir. 1998) (per curiam), plaintiffs argue that the allegations in their Second Amended Complaint are sufficient to show that Mr. and Mrs. Khansari

were themselves the subjects of the Officers' excessive force.   For example, just as Rivera had threatened to kill Ms. Petta in Petta, here, one Officer told Mrs. Khansari upon arrival at the residence, "I might have to kill somebody" and placed a round into the chamber as if preparing to fire. Also, just as Rivera pointed his .357 Magnum at Ms. Petta, here, one or more of the Officers aimed their guns at Mrs. Khansari, causing the red laser beam to appear as a dot on her person. Additionally, the Officers engulfed the Khansari residence heavily armed, in complete disregard for Mrs. Khansari's description of Corey's medical state and her repeated statements that [no]one there was armed.

---

[24]Id. at 6-7 ¶¶ 23-25

[25]Id. at 12 ¶ 39.   See also 27 ¶ 81.

The Officers yelled at Mr. Khansari to get out of the way
or that he would be arrested.  The Officers' aggressive
and frightening conduct — yelling at the Khansaris,
threatening them, and aiming high powered guns at them —
without justification placed all three Khansaris in a
state of fear for their lives.  Mrs. Khansari feared for
Corey's life, Corey feared for Mrs. Khansari's life, and
Mr. Khansari fell to the ground in a state of shock.
Accordingly, Mr. and Mrs. Khansari's claims arise not
only from the horror of witnessing their son being shot
with a taser in his eye but also from the Officers
actions aimed directly at Mr. and Mrs. Khansari.[26]

The plaintiffs' reliance on Petta, 143 F.3d at 900-01, in support of their right to recover damages for injuries suffered by Mr. and Mrs. Khansari are misplaced.  Petta involved an officer's use of excessive force against a mother and two young children in a car with her during an investigatory traffic stop.  The evidence showed that the children were more than bystanders to the use of force against their mother.  The officer's actions included screaming, banging on the car, shooting at the car, breaking windows, and other acts that the children not only watched their mother experience, but also experienced themselves.  The evidence included the children's own continued and severe psychological injuries as a result of actions directed not only towards their mother, but towards the car that they, too, occupied.  Id. at 902-03.  Petta does not support the argument that Mr. and Mrs. Khansari are able to assert § 1983 claims against the defendant officers.

A civil rights claim must be based upon a violation of a plaintiff's personal rights secured by the Constitution, and a

---

[26]Plaintiffs' Response to Individual Defendants' Motion to Dismiss, Docket Entry No. 31, pp. 21-22.

bystander who is not the object of police action cannot recover for
resulting emotional injuries under § 1983. See Grandstaff v. City
of Borger, Texas, 767 F.2d 161, 172 (5th Cir. 1985), cert. denied,
107 S. Ct. 1369 (1987); Coon v. Ledbetter, 780 F.2d 1158, 1160 (5th
Cir. 1986). See also Young v. Green, 2012 WL 3527040, *4 (S.D.
Tex. Aug. 15, 2012) ("[C]ase law holds that a bystander who
witnesses a police action, but who is not himself or herself the
object of that action, cannot recover for resulting emotional
injuries under § 1983, although there may be such a claim under
state tort law. There is no constitutional right to be free from
witnessing police action, apart from the question of whether that
action physically injured the target of that action.").

      Since the facts alleged in Plaintiffs' Second Amended
Complaint show that the only claims asserted for injuries suffered
by Mr. and Mrs. Khansari are claims for emotional distress arising
from witnessing police action against their son, Corey, the motions
of the individual defendants' to dismiss Mr. and Mrs. Khansari's
claims will be granted because their claims are not cognizable
under § 1983. See Grandstaff, 767 F.2d at 172; Coon, 780 F.2d at
1160-61. Because plaintiffs have failed to allege facts capable of
establishing a cognizable claim for the excessive use of force
against Mr. or Mrs. Khansari, plaintiffs are unable to maintain a
claim for the failure to prevent the excessive use of force against
Mr. and Mrs. Khansari. Accordingly, the motion to dismiss the
individual and bystander claims asserted against the individual

officer defendants under § 1983 arising from force asserted against or witnessed by Mr. and Mrs. Khansari will be granted.

**B. Claims Asserted Against Chief McClelland**

Defendants argue that the claims asserted against Chief McClelland should be dismissed because claims asserted against him in his official capacity duplicate claims asserted against the City, and because plaintiffs have failed to allege facts capable of supporting claims against him in his personal capacity. Defendants argue that

> Plaintiffs allege that the officers used excessive force against Corey, and that his parents, Debra and Michael Khansari suffered extreme emotional distress from witnessing the incident. Plaintiffs do not allege that Chief McClelland was present at the scene or in any way involved in the incident such as would give rise to claims for excessive force against him in his individual capacity. Thus, none of the allegations or causes of action alleged by Plaintiffs even attempt to set out any viable claim for relief against Chief McClelland in his individual capacity.[27]

In support of their argument that plaintiffs have failed to assert claims against Chief McClelland in his personal capacity, defendants point out that Plaintiffs' Second Amended Complaint asserts claims for "The City's Failure to Train and/or Supervise the Officers," "The City's Unlawful Policy and Custom," and "The City's Ratification;" but does not assert claims for Chief McClelland's failure to train or supervise the officers involved in

---

[27]Motion to Dismiss Claims Against Individual Defendants, Docket Entry No. 28, p. 8.

-34-

the incident at the Khansari's home, or for Chief McClelland's
ratification of the allegedly unconstitutional conduct of the
officers involved in that incident.[28]

### 1.   No Official Capacity Claims Are Stated Against Chief McClelland

Asserting that they have not made a claim against Chief
McClelland in his official capacity, plaintiffs argue that "a
dismissal would be improper as there is no such claim to dismiss."[29]
Because plaintiffs acknowledge that they have not asserted any
official capacity claims against Chief McClelland, defendants'
motion to dismiss such claims will be denied as moot.

### 2.   Facts Alleged Are Not Sufficient to State Personal Capacity Claims Against Chief McClelland

Plaintiffs argue that they

> do not allege that Chief McClelland was personally
> involved in the injuries to Corey Khansari.  Instead,
> they sue Chief McClelland under the theories that he
> failed to supervise the officers involved, failed to
> train his personnel to respond properly to mental health
> service calls, and ratified the unconstitutional conduct
> of his [officers].[30]

#### (a)   Failure to Train or Supervise

A § 1983 claimant must establish that the defendant was either
personally involved in the deprivation of Constitutional or federal

---

[28]Id.

[29]Plaintiffs' Response to Individual Defendants' Motion to
Dismiss, Docket Entry No. 31, p. 2.

[30]Id. at 3.

statutory rights or that his wrongful actions were causally connected to such deprivation. <u>James</u>, 535 F.3d at 373. "A supervisor is not personally liable for his subordinate's actions in which he had no involvement." <u>Id.</u> Plaintiffs allege that Chief McClelland's wrongful actions were his failure to train or supervise Houston police officers to respond properly to mental health service calls. The elements of a claim for failure to train or supervise are: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiffs' rights; and (3) the failure to train or supervise amounts to deliberate indifference to the constitutional right allegedly violated. <u>See</u> <u>Estate of Davis ex rel. McCully v. City of N. Richland Hills</u>, 406 F.3d 375, 381-82 (5th Cir. 2005). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Estate of Davis</u>, 406 F.3d at 381. Proof of more than a single instance of lack of training or supervision causing a violation of constitutional rights is generally required before such lack can constitute deliberate indifference. <u>Id.</u>

> To rely on the "single incident" exception, a plaintiff must prove that the "highly probable" consequence of a failure to train [or supervise] would result in the specific injury suffered, and that the failure to train [or supervise] represents the moving force behind the Constitutional violation.

Id. at 385-86.  Thus, to survive a motion to dismiss plaintiffs must allege facts capable of showing that the supervisor had notice of a pattern of prior acts fairly similar to what ultimately transpired, and despite that notice failed to train or supervise; or that the highly predictable consequence of his failure to train or supervise would result in injury to Corey.  Id. at 381-86.  See also Thompson v. Upshur County, 245 F.3d 447, 458-59 (5th Cir. 2001).

Plaintiffs do not allege and, in fact, acknowledge, that Chief McClelland was not present when excessive force was allegedly used against Corey.  Instead, plaintiffs argue that their Second Amended Complaint alleges that Chief McClelland "failed to train his personnel in the proper communication of crisis intervention requests for mentally ill persons, and dispatching appropriate personnel to the scene. . . [and] that a causal connection existed between the lack of training and the injuries to Corey Khansari."[31] Acknowledging that their claims for failure to train and supervise also require allegations of facts capable of establishing a pattern of constitutional violations, plaintiffs merely "assert in good faith that there are sufficient prior incidents of excessive force being used in mental health calls to support an allegation of a pattern or practice of such."[32]  Plaintiffs argue that

---

[31]Id. at 4.

[32]Id. at 5.

> [b]ecause the case is now at the motion to dismiss phase,
> providing proof of a pattern of constitutional violations
> is exceedingly difficult for a plaintiff, who has no
> source of pre-discovery evidence that they may produce to
> support such a claim.  In fact, Plaintiffs attempted to
> obtain certain pre-suit information in this matter, but
> Defendants refused to provide information and obtained
> support from the Attorney General's office in such
> refusal.  This resulted in the Defendants being able to
> refuse to provide factual information prior to suit and
> then filing a motion to dismiss based upon an alleged
> failure to plead proper factual information.[33]

Alternatively, plaintiffs argue that

> even absent a pattern, an allegation that a single
> instance supports a constitutional violation survives a
> motion to dismiss if the instance is egregious
> accompanied by deliberate indifference.  Under these
> pleadings, where Corey had committed no crime, had no
> weapons, and posed no legitimate danger to others,
> shooting him in the eye with one or more taser firings,
> including taser deployments subsequent to the dart being
> lodged in his eye, is sufficiently egregious to survive
> the "single incident" exception.  Furthermore, Plaintiffs
> contend that it has long been known to the . . . chief
> that failing to train [his] officers sufficiently to deal
> with mental health crises is highly likely to lead to the
> use of excessive force.[34]

As defendants correctly observe in their motion to dismiss,

Plaintiffs' Second Amended Complaint contains only conclusory

allegations that Chief McClelland failed to train or supervise

officers under his command.  Plaintiffs "seeking recovery under a

failure to train or supervise rationale must prove that the police

chief failed to control an officer's 'known propensity for the

improper use of force.'"  <u>Roberts v. City of Shreveport</u>, 397 F.3d

---

[33]<u>Id.</u> at 4.

[34]<u>Id.</u> at 5.

287, 292 (5th Cir. 2005) (quoting <u>Sims v. Adams</u>, 537 F.2d 829, 832 (5th Cir. 1976), and <u>Chestnut v. City of Quincy</u>, 513 F.2d 91, 92 (5th Cir. 1975)).  Moreover, to prove deliberate indifference, plaintiffs must demonstrate "at least a pattern of similar violations arising from training that is so clearly inadequate as to be obviously likely to result in a constitutional violation." <u>Id.</u> (quoting <u>Burge v. St. Tammany Parish</u>, 336 F.3d 363, 370 (5th Cir. 2003), <u>cert. denied</u>, 124 S. Ct. 1074 (2004)).  Plaintiffs fail to allege any foundational facts capable of showing that Chief McClelland was directly involved in the training or supervising of the officers involved in the incident at the Khansari's home on November 25, 2011; that the training or supervision that Chief McClelland provided to those officers was inadequate; or that Chief McClelland was aware of a pattern of prior violations by any of those officers that put him on notice that additional training or supervision was needed to prevent a violation of Corey's constitutional rights.

Plaintiffs' argument that this case fits within the narrow scope of the single incident exception has no merit because a "lone incident is insufficient to pierce the qualified immunity enjoyed by Chief [McClelland]." <u>Roberts</u>, 397 F.3d at 294.  Plaintiffs have neither cited a case that has relied on the single incident exception as a means of holding an individual supervisor liable in his personal capacity, nor alleged facts capable of establishing that this exception should be applied to Chief McClelland in this

case.   To rely on this exception plaintiffs must allege facts capable of establishing that the "highly predictable" consequence of Chief McClelland's failure to train or supervise would result in the specific constitutional injury at issue, and that the failure to train or supervise represented the "moving force" behind that injury.   See Estate of Davis, 406 F.3d at 385-86.   There are no allegations here that the officers at issue had not received any training or supervision, or that they had been involved in any cases involving the improper use of excessive force or tasers while responding to calls involving mental health patients.   Instead, plaintiffs merely allege that the training all Houston police officers received as a result of Chief McClelland's policies was not enough and that more or different training or supervision would have prevented the plaintiffs' injuries.   Such allegations are not sufficient to state a claim for failure to train or supervise against Chief McClelland in his personal capacity.   Roberts, 397 F.3d at 293 ("[M]ere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability.").   See City of Canton, Ohio v. Harris, 109 S. Ct. 1197, 1206 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").   Accordingly, defendants' motion to dismiss the § 1983

claims asserted against Chief McClelland for failure to train or supervise will be granted.

(b)   Ratification

This court is not aware of and plaintiffs have not cited any cases imposing personal liability on a supervisor based on ratification.   To the extent that ratification might, in some instances, be characterized as the implementation of an unconstitutional policy that causally results in the constitutional injury, subsequent ratification of a subordinate's excessive use of force does not state a claim for which relief may be granted in this case because such ratification could not have caused the constitutional injury about which the plaintiffs complain.   Any § 1983 claim plaintiffs have attempted to state against Chief McClelland for ratification of a subordinate's allegedly excessive use of force is therefore subject to dismissal because, as a matter of law, no such claim may be stated against Chief McClelland.   See Hobart v. City of Stafford, 916 F. Supp. 2d 783, 799 (S.D. Tex. 2013) (post-incident ratification cannot impart liability on a supervisor).

Some § 1983 plaintiffs have argued that inadequate use of force investigations performed as a matter of course may constitute a custom of rubber stamping use of force, which then emboldens police officers to employ force with impunity.   This theory may be viable under § 1983 although it often fails for lack of proof.   See

-41-

Diamond-Brooks v. City of Webster, Texas, 2014 WL 527910, *10 (S.D.
Tex. February 6, 2014). But the theory is not present in this case
because plaintiffs have not alleged any prior instances in which
Chief McClelland inadequately investigated uses of force, and they
have not alleged that Chief McClelland's practice of inadequately
investigating or ratifying uses of force caused the defendant
officers to use excessive force against Corey Khansari. Because
plaintiffs have not alleged any facts capable of establishing that
Chief McClelland approved a conscious and unlawful use of force by
any of the defendant officers, the court concludes that plaintiffs
have failed to state a § 1983 claim against Chief McClelland in his
personal capacity for ratification for which relief may be granted.
Accordingly, defendants' motion to dismiss the § 1983 ratification
claim asserted against Chief McClelland will be granted.

## C.  Texas Tort Claims Act Claims

Defendants argue that "[t]o the extent that Plaintiffs attempt
to sue both the City and the individual employees [for violation of
the Texas Tort Claims Act], the City's motion to dismiss the state
law claims against the individual defendants as required under
101.106(e) should be granted."[35] Plaintiffs respond that they "have
clearly alleged a Texas Tort Claims Act claim against only the City

---

[35]Motion to Dismiss Claims Against Individual Defendants,
Docket Entry No. 28, pp. 16-17 (citing City of Houston's Rule
12(b)(1) and 12(b)(6) Partial Motion to Dismiss Plaintiffs' Second
Amended Complaint ("City's Partial Motion to Dismiss"), Docket
Entry No. 27, p. 18).

and not the individual officers.  Thus, a dismissal of a claim that has not been asserted would be improper."[36]  Texas law prohibits suing both a governmental entity and its employees for tort claims. See Tex. Civ. Prac. & Rem. Code § 101.106 (Election of Remedies) See also Mission Consolidated Independent School District v. Garcia, 253 S.W.3d 653, 657 (Tex. 2008) ("[The TTCA] force[s] a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable.").  Since under Texas law plaintiffs cannot sue both a governmental entity and its employees, and since plaintiffs acknowledge that no claims have been asserted against Chief McClelland or the individual officers under the TTCA, defendants' motion to dismiss any TTCA claims asserted against Chief McClelland and the officer defendants will be denied as moot.

## IV.  Motion to Dismiss the City of Houston

Plaintiffs allege that the City of Houston is liable under 42 U.S.C. § 1983 for failing to train and supervise the individual officers, for ratifying their conduct, and for "bystander liability" arising from injuries suffered by Mr. and Mrs. Khansari.[37]

---

[36]Plaintiffs' Response to Individual Defendants' Motion to Dismiss, Docket Entry No. 31, p. 22.

[37]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, pp. 12-17 ¶¶ 40-51 ("The City's Failure to Train and/or Supervise the Officers"), pp. 17-21 ¶¶ 52-64 ("The City's Unlawful Policy and Custom"), pp. 21-24 ¶¶ 65-73 ("The City's Ratification").

Alternatively, plaintiffs allege that the City of Houston is liable for damages under the TTCA for "bystander liability" arising from injuries suffered by Mr. and Mrs. Khansari, and for injuries caused by the defendant officers' negligent use of tangible personal property.[38]  The City of Houston seeks dismissal of (1) the ¶ 1983 claims that Mr. and Mrs. Khansari assert for bystander liability, (2) the § 1983 claims asserted by all plaintiffs for ratification of the allegedly unconstitutional conduct of the individual officers, and (3) all TTCA claims.[39]

## A.   The City Is Entitled to Dismissal of § 1983 Claims for Bystander Liability and Ratification

### 1.   Bystander Liability Claims

The City argues that the claims for bystander liability should be dismissed because there is no § 1983 cause of action for bystanders who witness police actions but are not, themselves, the target of police action.[40]  For the reasons explained in § III.A.2(a)(3), above, the court has already concluded that the facts alleged in Plaintiffs' Second Amended Complaint are not capable of establishing that Mr. and Mrs. Khansari were targets, as opposed to mere witnesses, of a police action.  Accordingly, the

---

[38]Id. at 24 ¶ 74 ("In the alternative, pursuant to the Texas Tort Claims Act ("TTCA") (Tex. Civ. Prac. & Rem. Code 101.001, et seq.), and Texas common law, the City is liable for the actions of its employees, including the Officers.").

[39]City's Partial Motion to Dismiss, Docket Entry No. 27.

[40]Id. at 2, 4-7.

City's motion to dismiss the § 1983 claims that plaintiffs assert against the City for bystander liability will be granted for failure to state a claim for which relief may be granted.

    2.    Ratification

In pertinent part plaintiffs allege

> 68.   The City ratified the Officers' conduct by knowing of and approving their specific decisions and specific actions in this incident, including but not limited to the deployment of a taser when not necessary under the circumstances, escalating the encounter and/or deploying a taser into the face and eyes of an individual.  As a result, the City is responsible for the Officers' constitutional violations.  Prior to suit, the City did not provide information about the investigation of this incident.

> 69.   Since the filing of suit, the City has provided an extremely limited incident report but not investigative findings or chain of command review.  It is generally municipal policy for the chain of command, on up to the Chief of Police, to review use of force resulting in serious bodily injury and, upon information and belief, the chain of command in this case, up to and including the Chief of Police likely reviewed the use of force on Corey.[41]

The City argues that plaintiffs' § 1983 claims for ratification should be dismissed because plaintiffs fail to allege facts capable of establishing municipal liability for such a claim.[42]  The City argues that "Plaintiffs have not alleged that any policy maker for the City approved the allegedly unconstitutional

---

[41]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 22 ¶¶ 68-69.

[42]City's Partial Motion to Dismiss, Docket Entry No. 27, pp. 2, 7-9.

conduct after it occurred.  Further, Plaintiffs' own pleadings,
taken as true, demonstrate that this case does not present the
extreme factual situation required for a ratification claim in the
Fifth Circuit."[43]  The City argues that

> [p]laintiffs do not allege that they filed any complaint
> with the City of Houston or with the Houston Police
> Department that would have initiated an internal affairs
> investigation of the incident.  Plaintiffs allege without
> any basis that "it is generally municipal policy for the
> chain of command, on up to the Chief of Police, to review
> the use of force resulting in serious bodily injury" and
> that "the Chief of Police **likely reviewed** the use of
> force of Corey."[44]

Plaintiffs respond that the City's motion to dismiss their
ratification claims should be denied because they have sufficiently
pled facts that a policymaker for the City approved the
unconstitutional conduct after it occurred and that their case
represents the extreme factual situation required for a
ratification claim.[45]  In support of this argument plaintiffs
assert, <u>inter alia</u>, that

> • Corey was not a criminal suspect, but a civilian who
> needed mental health assistance.  The police officers
> with the City are aware and have been aware for years of
> the necessity to use crisis intervention training on
> mental health calls.  Such training states that those

---

[43]<u>Id.</u> at 7.

[44]<u>Id.</u> at 7-8 (quoting Plaintiffs' Second Amended Complaint,
Docket Entry No. 20, p. 22 ¶ 69).

[45]Plaintiffs Corey Khansari, Debra Khansari, and Michael
Khansari's Response to Defendant City of Houston's Rule 12(b)(1)
and 12(b)(6) Partial Motion to Dismiss Plaintiffs' Second Amended
Complaint ("Plaintiffs' Response to City's Partial Motion to
Dismiss"), Docket Entry No. 32, pp. 2, 5-7.

having a mental health crisis respond in a manner that is opposite that of the general population . . . With that knowledge, it was reckless and dangerous to approach Corey with weapons drawn and pointed and issuing commands. Under those circumstances, the approval of such conduct by the City, including its policymakers, is an unconstitutional ratification of an obvious violation of a clearly established right to be free from excessive force.

● Additionally, deploying a taser under the circumstances was unnecessary, particularly deploying — cycling — the taser five times for a total of twenty five seconds when one of the darts was lodged in Corey's eye was unnecessary, egregious and manifestly indefensible. The City, its officers and chain of command, are aware of the dangers of darts in the eye, repeated cycling and extended duration of taser deployment. Under these circumstances, the approval of such conduct is an unconstitutional ratification of an obvious violation of a clearly established right to be free from excessive force.[46]

In <u>Monell v. Department of Social Services of the City of New York</u>, 98 S. Ct. 2018, 2022, 2035-36 (1978), the Supreme Court held that municipalities are "persons" subject to suit under 42 U.S.C. § 1983, but that municipalities cannot he held liable on a <u>respondeat superior</u> basis, i.e., a municipality cannot be held liable simply because one of its employees violated a person's federal rights. For a municipality to be held liable under § 1983, the municipality itself must cause the violation through its policies. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

---

[46]<u>Id.</u> at 6-7.

injury that the government as an entity is responsible under § 1983." Id. at 2037-38.

The ratification theory of municipal liability has been recognized by the Supreme Court. See City of St. Louis v. Praprotnik, 108 S. Ct. 915 (1988). There the Court stated:

> When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

Id. (emphasis in original). The ratification theory is commonly employed in the employment context. "For example, if a school board—a policymaker . . . approves a superintendent's decision to transfer an outspoken teacher, knowing of the superintendent's retaliatory motive for doing so, the government entity itself may be liable; but if the school board lacks such awareness of the basis for the decision, it has not ratified the illegality and so the district itself is not liable." Milam v. City of San Antonio, 113 F. App'x 622, 626 (5th Cir. 2004).

Regardless of the context in which it is raised, the ratification theory "is necessarily cabined in several ways . . . to prevent the ratification theory from becoming a theory of *respondeat superior*." Milam, 113 F. App'x at 626-27. The mere failure to investigate a subordinate's decision does not amount to ratification. Id. And policymakers who simply go along with a subordinate's decision do not thereby vest final policymaking

-48-

authority in the subordinate. Id. The ratification theory must be applied with the understanding that "policymakers alone can create municipal liability, and so any violation must be causally traceable to them, not just to their subordinates." Id. Applying the ratification theory as plaintiffs propose in this case would turn it into *de facto respondeat superior.*

While the mere failure to investigate a police officer's conduct that allegedly violated a person's Fourth Amendment rights cannot amount to ratification, the converse must also be true: The mere decision to investigate and exonerate also cannot amount to ratification. In the example mentioned above, a school board approved, or ratified, with full knowledge, its subordinate's decision to commit an act that violates a person's constitutional rights. Because the school board acted with full knowledge and approved the conduct to be perpetrated by the school board's subordinate, the school board not only ratified such conduct, but the school board was complicit. That makes the constitutional violation traceable to the policymaker. Here, however, even assuming that the policymaker, Chief McClelland, reviewed the conduct of the officers who responded to the call for service at the Khansari's home, he reviewed that conduct after the fact, i.e., after the conduct had been committed without his approval. To hold the City liable because Chief McClelland concluded that the officers acted appropriately would convert liability through ratification into *respondeat-superior* liability. See Milam, 113

-49-

F. App'x at 627 ("It is not an easy fit because, at least facially, an illegal arrest that is completed without the involvement of any policymaker does not look like the typical situation in which a policymaker could 'approve[] [the employee's] decision and the basis for it' such that municipal policy can be said to have caused the harm."). Id. (quoting Praprotnik, 108 S. Ct. at 926). See also Fraire v. City of Arlington, 957 F.2d 1268, 1278-79 (5th Cir.), cert. denied, 113 S. Ct. 462 (1992) (refusing to infer an unconstitutional custom or policy from a municipality's failure to discipline an officer for a single incident). Plaintiffs have notably failed to allege facts capable of establishing a pattern or practice of ratifying similar acts and fail to cite any case in which a court has upheld a claim for ratification against a municipality under similar facts. The court therefore concludes that plaintiffs have failed to allege facts capable of establishing a § 1983 claim that the City ratified the officers' conduct. Accordingly, the City's motion to dismiss plaintiffs' § 1983 claim for ratification will be granted.

**B.   The City Is Not Entitled to Dismissal of the TTCA Claims**

As an alternative to the federal law claims asserted against the City of Houston, plaintiffs allege that the City of Houston is liable for damages under the Texas Tort Claims Act for injuries caused by the defendant police officers' negligent use of tangible personal property, i.e., taser guns, weapons, gear, badges, and

-50-

uniforms.   The City argues that the state law tort claims and TTCA claims should be dismissed for want of jurisdiction because the City is immune from damages arising from intentional torts.[47]

### 1.   Claims Arising from Use of Force Against Corey

In pertinent part plaintiffs allege that

> Officer Rutherford and potentially other Officers were negligent under the TTCA when they used or misused tangible personal property.  Specifically, and in the alternative to them acting intentionally or willfully, Plaintiffs allege that Officer Rutherford and potentially other Officers acted negligently in handling and/or firing their taser guns in such a manner that one or more tasers were deployed in the direction of Corey's head, causing them to land in or near Corey's eye.  Once the Officers decided to use taser guns, they implemented their use in an improper and negligent manner. Plaintiffs plead in the alternative that the Officers did not deploy their taser guns at Corey's head or eye but because they improperly handled their taser guns, they caused the taser guns to deploy in the direction of Corey's head or eye, which was negligent.[48]

A Texas municipality may not be held liable for Texas common law causes of action unless the Texas legislature has waived its governmental immunity.   University of Texas Medical Branch at Galveston v. York, 871 S.W.2d 175, 177 (Tex. 1994).   Immunity is only waived for claims brought under the TTCA, Tex. Civ. Prac. & Rem. Code §§ 101.001, et seq.   Id. (citing Lowe v. Texas Tech. University, 540 S.W.2d 297, 298-99 (Tex. 1976)).   In pertinent

---

[47]City's Partial Motion to Dismiss, Docket Entry No. 27, pp. 2, 9-18.

[48]Plaintiffs' Second Amended Complaint, Docket Entry No. 20, p. 25 ¶ 76.

part, the TTCA requires state law claims to arise in one of two ways: (1) from the conduct of a governmental unit's employee that involves the operation of a motor-driven vehicle or equipment; or (2) from the condition or use of tangible personal property or real property if the governmental unit would, were it a private person, be liable to the claimant under Texas law. Tex. Civ. Prac. & Rem. Code § 101.021. The TTCA also prohibits claims for intentional torts. Id. at 101.057. A claim properly stated as an intentional tort may not be restated as a claim for negligence. Lopez-Rodriguez v. City of Levelland, Texas, 100 F. App'x 272, 275 (5th Cir. 2004) (per curiam). However, the conduct underlying intentional torts may be a basis for proper claims of negligence. See Whittington v. City of Cuero, Texas, 2007 WL 951864, *12 (S.D. Tex. March 28, 2007) (citing Lopez-Rodriguez, 100 F. App'x at 275).

Plaintiffs' allegations "that the Officers did not deploy their taser guns at Corey's head or eye but because they improperly handled their taser guns, they caused the taser guns to deploy in the direction of Corey's head or eye, which was negligent," are similar to allegations in another TTCA case where the Fifth Circuit found that a negligence claim was stated. In Lopez-Rodriguez, 100 F. App'x at 275, the Fifth Circuit found that allegations the defendant officer was negligent "in failing properly to aim his firearm at the tires of [plaintiff's] vehicle," "in firing at [plaintiff] when it was not safe to do so," and "in failing to

ensure that there was proper space available to fire the gun" were sufficient to state a negligence claim under the TTCA.

In City of Lubbock v. Nunez, 279 S.W.3d 739 (Tex. App. — Amarillo, 2007, pet. dismissed), a Texas court of appeals reached the same conclusion on facts remarkably similar to those at issue here.  There, the City of Lubbock pleaded lack of jurisdiction by action of the TTCA because the complaint pleaded only intentional action by a police officer's use of a taser, and intentional action is not waived under the TTCA.  Id. at 742.  The Texas court found that although the taser had been intentionally used, negligence was at least implicitly pleaded as to the cause of the ensuing injuries.  Id. at 743 ("We cannot infer [officer's] intent to cause injury from his use of a taser, which appellees allege is advertised to be a 'non-lethal' or 'safe' incapacitation device. Therefore, we conclude that the appellees have pled a negligence cause of action and the City has not established that the intentional tort exception to the Texas Tort Claims Act's limited waiver of immunity applies.").  The Court based its finding on the Texas Supreme Court's holding in Reed Tool Co. v. Copelin, 689 S.W.2d 404, 406 (Tex. 1985), that the difference between a negligence cause of action and an intentional tort is not whether defendant intended the acts, but whether defendant intended the resulting injury.

In light of the Fifth Circuit's holding in Lopez-Rodriquez, 100 F. App'x at 275, and the Texas court's holding in Nunez, 279

S.W.3d 742, the court concludes that the plaintiffs' allegations
that the defendant officers injured Corey by firing their tasers at
him negligently should not be dismissed at this stage of the
lawsuit.

    2.   <u>Claims for Bystander Injuries Alleged by Corey's Parents</u>

    A state law bystander claim may be brought under the TTCA.
<u>Hermann Hospital v. Martinez</u>, 990 S.W.2d 476, 478-79 (Tex. App. —
Houston [14th Dist.] 1999, pet. denied); <u>Estate of Barrera v.
Rosamond Village Ltd. Partnership</u>, 983 S.W.2d 795, 799 & n.1 (Tex.
App. — Houston [1st Dist.] 1998, no pet); <u>City of Austin v. Davis</u>,
693 S.W.2d 31, 34 (Tex. App. — Austin 1985, writ ref'd n.r.e.).
Under Texas law

> a bystander who witnesses a negligently inflicted serious
> or fatal injury may recover for mental anguish if:
> (1) the bystander was located near the scene of the
> accident as contrasted with one who was a distance away
> from it; (2) the shock resulted from a direct emotional
> impact upon the bystander from the sensory and
> contemporaneous observance of the accident, as contrasted
> with learning of the accident from others after its
> occurrence; and (3) the bystander and the victim were
> closely related, as contrasted with an absence of any
> relationship or the presence of only a distant
> relationship.

<u>Martinez</u>, 990 S.W.2d at 478 (citing <u>Edinburg Hospital Authority v.
Trevino</u>, 941 S.W.2d 76, 80 (Tex. 1997) and <u>Freeman v. City of
Pasadena</u>, 744 S.W.2d 923, 924 (Tex. 1988)). Here, Mr. and
Mrs. Khansari personally observed Corey suffer severe injury, and
they are immediate family members of Corey. The City argues,
however, that governmental immunity for bystander injuries was not

waived in this case.   In support of its argument, the City relies
upon Barker v. City of Galveston, 907 S.W.2d 879, 889 (Tex. App. —
Houston [1st Dist.] 1995, writ denied).

Barker involved the interpretation of the section of the Texas
Civil Practices & Remedies Code for negligent use of tangible
personal property owned by a municipality.   See Tex. Civ, Prac. &
Rem. Code § 101.021(2).   The Barker court held that the plaintiffs
could not recover for personal or bystander injuries because they
could not prove that the city was negligent.   Barker, 907 S.W.2d at
886-87.   In other words, the court concluded that the bystander
could not recover because of insufficient proof of the city's
liability for the victim's injury.   Id.   See also Boyles v. Kerr,
855 S.W.2d 593, 598 (Tex. 1993) ("Before a bystander may recover,
he or she must establish that the defendant has negligently
inflicted serious or fatal injuries on the primary victim.").
Barker — like most of the other cases cited by the City — was
decided on a motion for summary judgment, not a motion to dismiss.
For the reasons stated in the preceding section, the court has
already concluded that the facts are not yet sufficiently developed
to determine whether Corey's injuries were incurred by conduct that
was intentional or negligent.   Thus, Barker and other cases on
which the City relies are inapplicable to the facts currently
before the court.   See, e.g., McIntosh v. Smith, 690 F. Supp. 2d
515, 539 (S.D. Tex. 2010) (summary judgment); Carnaby v. City of
Houston, 2009 WL 7806964, *16 (S.D. Tex. October 28, 2009) (motion

to reconsider grant of summary judgment).  Accordingly, the City's
motion to dismiss claims asserted under the TTCA will be denied.

### V.  Conclusions and Order

For the reasons explained in § III.A.2(a), above, the court
concludes that plaintiffs have alleged facts capable of stating
claims against the individual officer defendants for the excessive
use of force and for failure to prevent excessive use of force
arising from the tasering of Corey Khansari that are sufficient to
overcome the defendants' assertions of qualified immunity, but that
absent the development of additional facts the court is unable to
determine whether the individual officer defendants are entitled to
qualified immunity for these claims.  Therefore, defendants' motion
to dismiss claims asserted against the individual officer
defendants for excessive use of force and failure to prevent
excessive use of force against Corey Khansari is **DENIED**.

For the reasons explained in § III.A.2.(b), above, the court
concludes that plaintiffs have not alleged facts capable of stating
claims against the individual officer defendants for the excessive
use of force, the failure to prevent the use of excessive force, or
bystander liability arising from force asserted against or injuries
suffered by Debra or Michael Khansari.  Therefore, defendants'
motion to dismiss claims asserted against the individual officer
defendants by Debra and Michael Khansari is **GRANTED**.

-56-

For the reasons explained in § III.B.1, above, the court concludes that the plaintiffs have not alleged or attempted to allege claims against Chief McClelland in his official capacity. Therefore, defendants' motion to dismiss claims asserted against Chief McClelland in his official capacity is **DENIED** as **MOOT**.

For the reasons explained in § III.B.2, above, the court concludes that the plaintiffs have failed to allege facts capable of stating any claims for which relief may be granted against Chief McClelland in his personal capacity. Therefore, defendants' motion to dismiss claims asserted against Chief McClelland in his personal capacity is **GRANTED**.

For the reasons explained in § III.C, above the court concludes that plaintiffs have not alleged or attempted to allege claims against the individual officer defendants or Chief McClelland pursuant to the Texas Tort Claims Act. Therefore, defendants' motion to dismiss Texas Tort Claims Act claims asserted against the individual officer defendants and Chief McClelland in their personal capacities is **DENIED** as **MOOT**.

For the reasons explained in § IV.A, above, the court concludes that the plaintiffs have failed to allege facts capable of stating claims under 42 U.S.C. § 1983 against the City of Houston for bystander liability arising from injuries suffered by Debra and Michael Khansari or for ratification. Therefore, the

City of Houston's motion to dismiss § 1983 claims for bystander liability and ratification is **GRANTED**.

For the reasons explained in § IV.B, above, the court concludes that the plaintiffs have alleged facts capable of stating claims against the City of Houston pursuant to the Texas Tort Claims Act for negligent use of personal property arising from the tasering of Corey Khansari and for bystander liability arising from Debra Khansari and Michael Khansari having witnessed that tasering. The City of Houston's motion to dismiss claims asserted pursuant to the Texas Tort Claims Act is therefore **DENIED**.

The Rule 12(b)(6) Motion to Dismiss Plaintiffs' Second Amended Complaint by Defendants Charles A. McClelland, Jr., William Rutherford, Candice Vaughn, Jillian McGowan, Maria Hernandez, Sean Hunter, Jorge Herrera and Walter Gaw (Docket Entry No. 28) is **GRANTED in PART and DENIED in PART**.

The City of Houston's Rule 12(b)(1) and 12(b)(6) Partial Motion to Dismiss Plaintiffs' Second Amended Complaint (Docket Entry No. 27) is **GRANTED in PART and DENIED in PART**.

During the next forty-five (45) days the parties may engage in paper discovery aimed solely at determining whether the officer defendants are entitled to qualified immunity and may attempt to settle the case. If, at the end of the 45-day period the parties are unable to settle this action, the parties will provide the

court with the name, address, telephone and facsimile numbers, and e-mail address of an agreed upon mediator.  If the case does not settle, the court will schedule an initial pretrial and scheduling conference.

**SIGNED** at Houston, Texas, on this the 9th day of April, 2014.

SIM LAKE
UNITED STATES DISTRICT JUDGE