United States District Court
Southern District of Texas

**ENTERED**

October 28, 2015

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

COREY KHANSARI,                §
DEBRA KHANSARI, and            §
MICHAEL KHANSARI,              §
                               §
          Plaintiffs,          §
                               §
v.                             §
                               §
THE CITY OF HOUSTON, CHIEF OF  §
POLICE CHARLES A. MCCLELLAND,  §    CIVIL ACTION NO. H-13-2722
JR., OFFICER WILLIAM E.        §
RUTHERFORD, OFFICER CANDACE M. §
BRADSHAW VAUGHN, OFFICER       §
JILLIAN MCGOWAN, OFFICER MARIA §
HERNANDEZ, OFFICER SEAN HUNTER,§
OFFICER JORGE LUIS HERRERA,    §
and OFFICER WALTER GAW,        §
                               §
          Defendants.          §

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Corey Khansari ("Corey"), and his parents, Debra Khansari ("Mrs. Khansari"), and Michael Khansari ("Mr. Khansari"), filed this action against defendants, the City of Houston (the "City"), Chief of Police Charles A. McClelland, Jr., and individual police officers William E. Rutherford ("Rutherford"), Candace M. Bradshaw Vaughan ("Vaughan"), Jillian McGowan ("McGowan"), Maria Hernandez ("Hernandez"), Sean Hunter ("Hunter"), Jorge Luis Herrera ("Herrera"), and Sergeant Walter Gaw ("Gaw"), under 42 U.S.C. § 1983 for violation of civil rights guaranteed by the Fourth Amendment to the United States Constitution and, in the

alternative, against the City for negligent conduct of its employees under the Texas Tort Claims Act ("TTCA").  In an April 9, 2014, Memorandum Opinion and Order (Docket Entry No. 35), Khansari v. City of Houston, 14 F. Supp. 3d 842 (S.D. Tex. 2014), the court granted in part and denied in part defendants' motions to dismiss and allowed the following claims to proceed:  claims under 42 U.S.C. § 1983 that Corey has asserted against the individual officer defendants in their personal capacities for use of excessive force in violation of rights guaranteed by the Fourth Amendment to the United States Constitution; claims under 42 U.S.C. § 1983 that all plaintiffs have asserted against the City for failure to train and supervise the individual officer defendants in violation of rights guaranteed by the Fourteenth Amendment to the United States Constitution; and claims that all plaintiffs have asserted against the City pursuant to the TTCA for negligent use of personal property arising from the deployment of a taser at Corey and for bystander liability arising from Mr. Khansari and Mrs. Khansari having witnessed that taser deployment.  Pending before the court is Defendants' Motion for Summary Judgment (Docket Entry No. 65), in which all of the defendants seek summary judgment on all of the claims asserted against them.  For the reasons set forth below, the pending motion will be denied as to the § 1983 claims that Corey has asserted against Officers Rutherford and Vaughan and granted as to all the other claims remaining in this action.

-2-

## I.  <u>Standard of Review</u>

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2510 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not <u>negate</u> the elements of the nonmovant's case." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (<u>en banc</u>) (quoting <u>Celotex</u>, 106 S. Ct. at 2553).

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by admissible evidence that facts exist over which there is a genuine issue for trial.  <u>Id.</u> "[T]he nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in <em>any</em> case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'"  <u>Id.</u>

A party opposing summary judgment must point to an evidentiary conflict in the record.  Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  <u>Little</u>, 37 F.3d at 1075.  <u>See also</u> <u>Antoine v. First Student, Inc.</u>, 713 F.3d 824, 830 (5th Cir. 2013) ("We resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.").  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 120 S. Ct. 2097, 2110 (2000).

## II.  <u>Undisputed Facts</u>[1]

### A.  Events of November 25, 2011

The events at issue occurred on November 25, 2011, when the Houston Fire Department ("HFD") responded to a call from the Khansari residence regarding Corey's possible overdose and attempted suicide.  At that time Corey was a 19-year old suffering from allergies and anxiety for which he had been prescribed medications, including an epinephrine pen ("Epi-Pen") used to treat

---

[1]The statement of undisputed facts is taken from Defendants' Motion for Summary Judgment ("Defendants' MSJ"), Docket Entry No. 65, pp. 4-15; Plaintiffs Corey Khansari's, Debra Khansari's, and Michael Khansari's Response to Defendants' Motion for Summary Judgment ("Plaintiffs' Response"), Docket Entry No. 70, pp. 2-18; and the exhibits cited in these two instruments.

anaphylactic shock.   When Emergency Medical Technicians ("EMTs")
arrived at the Khansari residence, Corey refused treatment, yelling
at the EMTs to stay away.   Whether Corey was armed with a dangerous
weapon, i.e., a knife, is disputed.   The EMTs retreated and called
the Houston Police Department ("HPD") for assistance.   The first
HPD officers to arrive at the scene were Rutherford and Vaughan.
Upon arrival Rutherford stopped to speak with the EMTs;[2] Vaughan
exited her patrol vehicle and loaded her shotgun.[3]  Both Rutherford
and Vaughan knew that the purpose of the call was to assist the HFD
in providing medical assistance for an attempted suicide, not to
investigate a crime.[4]  Eddie Hestand ("Hestand"), a clergyman with
the Police and Clergy Team ("PACT") was doing a ride-along with
Vaughan and accompanied Vaughan to the Khansari residence.[5]

---

[2]Oral and Videotaped Deposition of William E. Rutherford
("Rutherford Deposition"), Exhibit A-5 to Plaintiffs' Response,
Docket Entry No. 70-5, p. 36:16-23; Affidavit of William R.
Rutherford ("Rutherford Affidavit"), Exhibit 19 to Defendants' MSJ,
Docket Entry No. 65-19, ¶ 4.

[3]Oral and Videotaped Deposition of Candace M. Bradshaw Vaughan
("Vaughan Deposition"), Exhibit A-6 to Plaintiffs' Response, Docket
Entry No. 70-6, pp. 46:23-48:4; Affidavit of Candace M. Bradshaw
Vaughan ("Vaughan Affidavit"), Exhibit 20 to Defendants' MSJ,
Docket Entry No. 65-20, ¶ 5.

[4]Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response,
Docket Entry No. 70-5, p. 28:15-25; Rutherford Affidavit,
Exhibit 19 to Defendants' MSJ, Docket Entry No. 65-19, ¶ 4; Vaughan
Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry
No. 70-6, pp. 5:18-6:3, 19:6-15, 46:12-22; Vaughan Affidavit,
Exhibit 20 to Defendants' MSJ, Docket Entry No. 65-20, ¶ 4.

[5]Oral Deposition of Eddee Hestand ("Hestand Deposition"),
Exhibit A-4 to Plaintiffs' Response, Docket Entry No. 70-4,
pp. 13:15-16:12, 25:4-8.

Hestand knew that the purpose of the call was to assist an individual in crisis, not to investigate a crime.[6]   Other HPD officers arrived at the scene after Rutherford and Vaughan, but whether they arrived before or after Corey was hit with taser darts and injured is disputed.[7]

Rutherford and Vaughan encountered Mrs. Khansari outside the residence, and Corey in a doorway yelling.  Whether Corey was armed with lethal weapons, i.e., two kitchen knives is disputed. Rutherford pointed his taser at Corey, and a red laser dot from the taser appeared on Corey.[8]  Mrs. Khansari placed herself between Corey and the officers, Corey pushed his mother to the ground, Rutherford discharged his taser hitting Corey with two darts, one in an eye and the other in his abdomen, and Corey collapsed to the ground.[9]  When Corey tried to get up, Rutherford asked Vaughan what to do, Vaughan told Rutherford to tase Corey again, and Rutherford

_____

[6]Hestand Deposition, Exhibit A-4 to Plaintiffs' Response, Docket Entry No. 70-4, pp. 28:25-29:3.

[7]Oral Deposition of Debra Khansari ("Mrs. Khansari Deposition"), Exhibit A-2 to Plaintiffs' Response, Docket Entry No. 70-2, p. 36:1-23; Oral Deposition of Michael Khansari ("Mr. Khansari Deposition"), Exhibit A-3 to Plaintiffs' Response, Docket Entry No. 70-3, pp. 28:22-30:12.

[8]Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, p. 66:10-20; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 95:20-96:1.

[9]Rutherford Affidavit, Exhibit 19 to Defendants' MSJ, Docket Entry No. 65-19, ¶ 7; Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, pp. 69:17-22, 71:23-25, 73:25-74:8, 78:1-14; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 95:20-96:1.

recycled his taser four more times in rapid succession.[10]   Whether Corey tried to get up holding two knives is disputed.   Corey managed to disconnect the wires and retreat into his residence.[11] Rutherford informed a supervisor over the radio that the taser had been deployed, and Sergeant Gaw subsequently arrived at the scene.[12]

Once Corey was inside the residence officers established a perimeter around it.   Corey called his mother on a cell phone, Mrs. Khansari handed the phone to an EMT, and the EMT persuaded Corey to come to the door.   Corey was then placed into an ambulance and transported to St. Joseph Hospital where he received emergency eye surgery.   Corey has since had numerous eye surgeries, lost vision in one eye, and suffers nerve pain on one side of his face.

## B.   City Policy and Training of the Individual Officer Defendants

On November 25, 2011, when the events at issue occurred all of the individual HPD officer defendants were licensed Texas peace officers.   Rutherford and Vaughan had each completed Conductive

---

[10]Id.   See also Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, pp. 73:25-74:8; 76:16-78:20; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, p. 97:19-22.

[11]Rutherford Affidavit, Exhibit 19 to Defendants' MSJ, Docket Entry No. 65-19, ¶ 7; Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, p. 78:1-20; Vaughan Affidavit, Exhibit 20 to Defendants' MSJ, Docket Entry No. 65-20, ¶ 8; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 97:19-100:23.

[12]Rutherford Affidavit, Exhibit 19 to Defendants' MSJ, Docket Entry No. 65-19, ¶ 8.

Energy Device ("CED" or "Taser") training at the Houston Police Academy, and were each Crisis Intervention Team officers who had not only completed 40 hours of Crisis Intervention Techniques ("CIT") training but also had completed refresher and update CIT training.[13]

HPD has specific policies on the use of tasers and how to handle persons with mental illness. HPD General Order 400-26 provides guidance on the use of tasers.[14] Under this general order officers are not authorized to carry or use a taser until they have received required training, and officers are required to qualify with their tasers annually during their birth month. Officers are directed not to use tasers on persons known to be mentally ill unless exigent circumstances exist. This general order establishes a review process for each taser activation requiring a supervisor not only to be present but also to document the actions taken by the officer and specific information to be gathered so that use of the taser can be reviewed by the division commander. Any

---

[13]Defendants' MSJ, Docket Entry No. 65, pp. 11-12 (citing Expert Report of John H. Chen, Assistant Chief of Police Staff Services Command Houston Police Department, Exhibit 9 to Defendants' Designation of Experts/Expert Disclosure, Docket Entry No. 59-2, pp. 4-7; Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, p. 166:3-20; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 134:6-135:5; Rutherford Certification Records and Vaughan Certification Records, Exhibits 12-13 to Defendants' MSJ, Docket Entry Nos. 65-12 and 65-13).

[14]General Order 400-26, Conductive Energy Devices, Exhibit 15 to Defendants' MSJ, Docket Entry No. 65-15.

misconduct or violation of policy is to be reported to Internal Affairs. Rutherford's use of his taser on November 25, 2011, was reviewed, documented in a report, and subjected to the taser review process.

HPD General Order 500-12 provides officers guidance on handling individuals with mental illness.[15] This general order focuses on the need to secure medical assistance for their mental illness, but also recognizes that they may still be subject to charges for criminal acts such as assault.

### III.   Section 1983 Claims

Plaintiffs argue that intentional actions of the individual police officer defendants make them each liable under 42 U.S.C. § 1983 for infringing Corey's rights to be free from excessive force in violation of the Fourth Amendment by depriving Corey of his constitutional right to be free from an unreasonable seizure that proximately caused Corey to suffer severe injury; and that the City is liable for the officers' deprivation of all plaintiffs' constitutional rights for failing to adequately train the defendant officers to handle an individual in a mental health crisis; and for having a custom or practice of excessive force by use of a taser. Asserting that the individual officer defendants are entitled to qualified immunity from suit, and that plaintiffs are unable to

---

[15]General Order 500-12, Persons Suspected of Mental Illness, Exhibit 16 to Defendants' MSJ, Docket Entry No. 65-16.

cite evidence capable of proving that a City custom or policy caused the plaintiffs to suffer deprivation of a right secured by the Constitution or laws of the United States, all of the defendants seek summary judgment on all of the claims asserted against them.

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . .

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Conner, 109 S. Ct. 1865, 1870 (1989) (quoting Baker v. McCollan, 99 S. Ct. 2689, 2694 n.3 (1979)).  To establish § 1983 liability, plaintiffs must prove that they suffered "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004) (citing Bush v. Viterna, 795 F.2d 1203, 1209 (5th

Cir. 1986)).  Plaintiffs must also show that the constitutional or statutory deprivation they suffered was intentional or due to deliberate indifference and not the result of mere negligence.  Id. (citing Baker, 99 S. Ct. at 2695).

**A.    Claims Asserted Against the Individual Defendants**

    1.    Applicable Law

Public officers may be sued under § 1983 in their official and/or their personal capacities.  Hafer v. Melo, 112 S. Ct. 358, 361-63 (1991) (citing Kentucky v. Graham, 105 S. Ct. 3099 (1985)). For reasons stated in the April 9, 2014, Memorandum Opinion and Order, Khansari, 14 F. Supp. 3d at 852-61, the court dismissed any claims that plaintiffs had asserted or attempted to assert against the individual officers in their official capacities, but allowed the claims asserted against them in their personal capacities to proceed.  To establish a personal-capacity claim under § 1983 plaintiffs must establish that while acting under color of state law defendants were personally involved in the deprivation of a right secured by the laws or Constitution of the United States, or that defendants' wrongful actions were causally connected to such a deprivation.  James v. Texas Collin County, 535 F.3d 365, 373 (5th Cir. 2008).  Absent personal involvement or causal connection, supervisors cannot be held liable for a subordinate's actions.  Id.

Public officials sued in their personal capacities under § 1983 are shielded from suit by the doctrine of qualified

immunity.  <u>Saucier v. Katz</u>, 121 S. Ct. 2151, 2154 (2001), <u>overruled</u> <u>in part by</u> <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 813 (2009). "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012) (citing <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2080 (2011)). "To be clearly established, a right must be sufficiently clear 'that every "reasonable" official would [have understood] that what he is doing violates that right.'" <u>Id.</u> (quoting <u>al-Kidd</u>, 131 S. Ct. at 2078, and <u>Anderson v. Creighton</u>, 107 S. Ct. 3034, 3039 (1987)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 129 S. Ct. at 815. "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" <u>Id.</u> (quoting <u>Groh v. Ramirez</u>, 124 S. Ct. 1284, 1295 (2004)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" <u>Id.</u> (citing <u>Mitchell v. Forsyth</u>, 105 S. Ct. 2806, 2815 (1985)).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first prong asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014) (quoting Saucier, 121 S. Ct. at 2156). When, as here, a plaintiff alleges excessive use of force, the federal right at issue is the Fourth Amendment right against unreasonable seizures. Id. (quoting Graham, 109 S. Ct. at 1871). "The inquiry into whether this right was violated requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion.'" Id. at 1865-66 (quoting Tennessee v. Garner, 105 S. Ct. 1694, 1699 (1985)). In Garner, 105 S. Ct. at 1700, the Supreme Court explained that "the question [is] whether the totality of the circumstances justified a particular sort of . . . seizure." See also Ramirez v. Martinez, 716 F.3d 369, 377 (5th Cir. 2013) ("In determining whether a use of force was reasonable, we look to the totality of the circumstances.").

To raise a material fact issue on the claim that he suffered a violation of his constitutional right to be free from excessive use of force, Corey must cite evidence capable of proving that he suffered "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was clearly unreasonable." Ramirez, 716 F.3d at 377 (quoting

Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir. 2011)).  In Graham,
109 S. Ct. at 1865, the Supreme Court articulated three factors for
courts to use when determining if a particular use of force was
excessive to the need or unreasonable under the circumstances.  The
Graham factors are:  (1) the severity of the crime at issue;
(2) whether the suspect posed an immediate threat to police
officers or civilians; and (3) whether the suspect was actively
resisting arrest or attempting to evade arrest by fleeing the
scene.  Id. at 1872.  The Graham factors provide the framework for
judging whether an officer's use of force was excessive.  Ramirez,
716 F.3d at 377.  See also Newman v. Guedry, 703 F.3d 757, 761 (5th
Cir. 2012), cert. denied, 134 S. Ct. 162 (2013) ("Some relevant
considerations include 'the severity of the crime at issue, whether
the suspect pose[d] an immediate threat to the safety of the
officers or others, and whether he [was] actively resisting arrest
or attempting to evade arrest by flight.'").

    "The second prong of the qualified-immunity analysis asks
whether the right in question was 'clearly established' at the time
of the violation." Tolan, 134 S. Ct. at 1866 (quoting Hope v.
Pelzer, 122 S. Ct. 2508, 2515 (2002)).  "Governmental actors are
'shielded from liability for civil damages if their actions did not
violate "clearly established statutory or constitutional rights of
which a reasonable person would have known."'" Id. (quoting Hope,
122 S. Ct. at 2515).  "'[T]he salient question . . . is whether the
state of the law' at the time of an incident provided 'fair

warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" Id. (quoting Hope, 122 S. Ct. at 2516). In cases alleging unreasonable seizures, the Supreme Court has instructed lower courts to "define the 'clearly established' right at issue on the basis of the 'specific context of the case.'" Id. (quoting Saucier, 121 S. Ct. at 2156). The Supreme Court has also cautioned lower courts "not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." Id. (citing Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004)). In Brosseau the Supreme Court explained that

> It is important to emphasize that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." . . . As we previously said in this very context:
>
>> "[T]here is no doubt that Graham v. Connor, supra, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in Anderson [v. Creighton] 'that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

125 S. Ct. at 599 (citations omitted). See also Manis v. Lawson, 585 F.3d 839, 845-46 (5th Cir. 2009) ("A right is clearly

established if, in light of preexisting law, the unlawfulness of an action would be apparent to a reasonable officer.").

"Courts have discretion to decide the order in which to engage the two prongs [of the qualified immunity analysis]." <u>Tolan</u>, 134 S. Ct. at 1866 (citing <u>Pearson</u>, 129 S. Ct. at 818). <u>See also</u> <u>Reichle</u>, 132 S. Ct. at 2093 (noting that consideration of the second prong first "comports with [the] usual reluctance to decide constitutional questions unnecessarily"). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." <u>Id.</u>

> This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

<u>Id.</u> (quoting <u>Anderson</u>, 106 S. Ct. 2511).

In a multi-defendant case such as this courts examine each officer's actions independently to determine whether he or she is entitled to qualified immunity. <u>Newman</u>, 703 F.3d at 762 (citing <u>Meadours v. Ermel</u>, 483 F.3d 417, 421-22 (5th Cir. 2007)). Once a defendant asserts qualified immunity the burden shifts to the plaintiffs, who bear the burden of negating the defense of qualified immunity. <u>Id.</u> at 761 ("Although qualified immunity is 'nominally an affirmative defense,' the plaintiff bears a heightened burden 'to negate the defense once properly raised.'").

-16-

2.   Application of the Law to the Undisputed Facts

(a)   Officer Rutherford

The court's denial of the defendants' motions to dismiss was based largely on the parties' inability to identify which of the officer defendants fired the taser that injured Corey.  Plaintiffs acknowledge that they are only able to cite evidence capable of showing that Rutherford deployed a taser at Corey.[16]  See Khansari, 14 F. Supp. 3d at 861.  Defendants do not challenge Corey's allegations of injury and causation from deployment of Rutherford's taser.  Instead, defendants' briefing focuses on whether Rutherford's decision to tase Corey was clearly excessive to the need and objectively unreasonable.  Defendants argue that Rutherford's initial deployment of his taser against Corey was reasonably proportionate to the circumstances because Corey was yelling, brandishing two knives, and posing an imminent threat to himself and others -- in particular to his mother whom Corey pushed to the ground.[17]  Asserting that Rutherford "drew a non-lethal

---

[16]Plaintiffs' Response, Docket Entry No. 70, pp. 8-9.  See also Rutherford Affidavit, Exhibit 19 to Defendants' MSJ, Docket Entry No. 65-19, ¶ 7; Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, pp.  69:17-22, 71:23-25, 73:25-74:8, 78:1-14; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 95:20-96:1 (acknowledging that Rutherford deployed his taser against Corey).

[17]Defendants' MSJ, Docket Entry No. 65, pp. 24-26 (citing Rutherford Affidavit, Exhibit 19 to Defendants' MSJ, Docket Entry No. 65-19, ¶¶ 4-7; Vaughan Affidavit, Exhibit 20 to Defendants' MSJ, Docket Entry No. 65-20, ¶¶ 4-7).

weapon, even though Corey was brandishing lethal weapons,"[18] defendants argue that Rutherford's "actions at this point were fully justified in light of the fact that Corey had possession of lethal weapons and had threatened the firefighters, his parents, and the officer."[19]

Defendants also argue that Rutherford's recycling of his taser four additional times was reasonable because even though Corey fell to the ground after being struck in the eye and the abdomen by taser darts, Corey failed to obey commands to drop the knives and surrender and, instead, continued trying to get up holding two knives.[20] In support of the argument that Rutherford's actions were not clearly excessive or objectively unreasonable, defendants cite the testimony of Rutherford and Vaughan that Corey was armed with two knives and threatening his mother prior to the first taser deployment, and that even though Cory fell to the ground after being hit by taser darts, recycling of the taser four additional times was reasonable because Corey remained non-compliant with the officers' commands to drop the knives and surrender.[21]

---

[18]Id. at 25.

[19]Id.

[20]Id. at 25-26.

[21]Id. (citing Rutherford Affidavit, Exhibit 19 to Defendants' MSJ, Docket Entry No. 65-19, ¶ 7; Vaughan Affidavit, Exhibit 20 to Defendants' MSJ, Docket Entry No. 65-20, ¶ 8).

Plaintiffs counter that Rutherford's initial tasing of Corey was clearly excessive to the need and objectively unreasonable because although Corey was yelling, Corey was not brandishing any knives but, instead, possessed only an Epi-pen and a cell phone, and was not posing an imminent threat to anyone.[22] Acknowledging that Rutherford and Vaughan testified that Corey had knives, plaintiffs argue that the officers have no credibility because the officers' testimony that Corey held knives is contradicted not only by the testimony of Corey and his parents, but also by the testimony of Eddee Hestand, the clergyman who was riding along with Vaughan that evening. Plaintiffs argue that "Clergyman Hestand, who saw Corey from at least three vantage points on the day of the Incident, did not recall seeing any knives in Corey's hands."[23] Acknowledging that Corey pushed his mother to the ground, plaintiffs argue that Corey did not pose a threat to his mother because he did not push her for the purpose of causing harm but, instead, for the purpose of protecting her by moving her out of the

---

[22]Plaintiffs' Response, Docket Entry No. 70, p. 24 (citing Oral Deposition of Corey Khansari ("Corey Deposition"), Exhibit A-1 to Plaintiffs' Response, Docket Entry No. 70-1, pp. 26:18-27:5, 38:18-22; Mrs. Khansari Deposition, Exhibit A-2 to Plaintiffs' Response, Docket Entry No. 70-2, pp. 31:24-32:3; Mr. Khansari Deposition, Docket Entry No. 70-3, pp. 29:24-30:7).

[23]Plaintiffs' Response, Docket Entry No. 70, p. 11 (citing Hestand Deposition, Exhibit A-4 to Plaintiffs' Response, Docket Entry No. 70-4, pp. 44:25-46:1, 64:10-22, and Exhibits 8, 9, and 10, thereto).

aim of HPD weapons that were pointed at her and evidenced by red laser dots that Corey could see on her.[24]

Plaintiffs also argue that Rutherford's recycling of his taser four additional times was clearly excessive to the need and objectively unreasonable because the taser was recycled in rapid succession while Corey lay on the ground incapacitated and unable to harm anyone.[25] In support of this argument plaintiffs cite HPD's Taser Download Report showing two (2) seconds between the first and second cyclings,[26] zero (0) seconds between the second and third cyclings,[27] four (4) seconds between the third and fourth cyclings,[28] and fifteen (15) seconds between the fourth and fifth cyclings.[29] Because Corey had only seconds to comply with the officers' commands to surrender before Rutherford recycled his taser, plaintiffs argue that the force Rutherford used against Corey was

---

[24]Id. at 24-25.

[25]Id. at 25-26 (citing Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, pp. 73:25-74:8; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 87:5-7, 91:12-24).

[26]Plaintiffs' Response, Docket Entry No. 70, p. 9 (citing Oral Videotaped Deposition of David Michael Lopez ("Lopez Deposition"), Exhibit A-8 to Plaintiffs' Response, Docket Entry No. 71-2, p. 68:13-15).

[27]Id. (citing Lopez Deposition, Exhibit A-8 to Plaintiffs' Response, Docket Entry No. 71-2, pp. 68:21-69:4).

[28]Id. (citing Lopez Deposition, Exhibit A-8 to Plaintiffs' Response, Docket Entry No. 71-2, pp. 69:5-6).

[29]Id. (citing Taser report, Exhibit B-1 to Plaintiffs' Response, Docket Entry No. 73-1).

clearly excessive to the need and objectively unreasonable because Corey was an individual in need of medical treatment, not a criminal suspect, Corey did not pose an imminent threat to anyone, and Corey was not resisting arrest or attempting to flee.[30]

Rutherford responds that his actions both in initially firing the taser and in recycling the taser four times "were objectively reasonable and made on the basis of his reasonable belief that Corey Khansari posed an imminent threat to Officer Rutherford or to others of serious bodily injury."[31]   The Fifth Circuit has not addressed a fact pattern precisely on point, but this court's analysis of whether Rutherford's conduct was excessive to the need and objectively unreasonable is guided by two recently decided cases that involve similar claims of excessive force arising from taser use -- Ramirez, 716 F.3d at 369, and Poole v. City of Shreveport, 691 F.3d 624 (5th Cir. 2012).

In Ramirez the Fifth Circuit affirmed the district court's denial of a defendant officer's motion for summary judgment holding that use of a taser against an arrestee would constitute excessive force if as the plaintiff contended several officers "forced him to the ground without resistance on his part" and the arresting officer "tased him after subduing and handcuffing him."  716 F.3d at 378.   The Fifth Circuit explained that "[t]he district court

---

[30]Plaintiffs' Response, Docket Entry No. 70, pp. 24-26.

[31]Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Defendants' Reply"), Docket Entry No. 95, p. 10.

properly determined that a reasonable officer would view [the arresting officer's] use of force under [the plaintiff's] version of the facts to be clearly excessive and objectively unreasonable under the circumstances.  Thus, a jury must determine the facts at trial." Id. at 379.

In Poole the Fifth Circuit affirmed the district court's grant of summary judgment to the defendant officers holding that use of a taser was not excessive where the plaintiff had been resisting arrest and the officers ceased using the taser once the plaintiff had been subdued and handcuffed.  The Fifth Circuit explained that the defendant officers had not employed excessive force but had, instead, responded with "measured and ascending" actions, including taser use, that corresponded to the plaintiff's escalating verbal and physical resistance in a "tense, uncertain, and rapidly evolving" situation.  Poole, 691 F.3d at 629.

The Fifth Circuit's analysis in both Ramirez and Poole was guided by the factors the Supreme Court identified in Graham, 109 S. Ct. at 1872, i.e., (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene.  See Newman, 703 F.3d at 761 ("Some relevant considerations include 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to safety of the officers or others, and whether he [was] actively resisting arrest or attempting to

-22-

evade arrest by flight."). So, too, the <u>Graham</u> factors guide the court's analysis here.

The undisputed evidence shows that Rutherford went to Corey's house to assist EMTs who responded to a call for emergency medical services and encountered a possibly suicidal individual who refused medical treatment, that Corey had committed no crime, had resisted medical treatment, but was not resisting arrest or attempting to flee. Therefore, the first and third <u>Graham</u> factors weigh against Rutherford. What happened next is disputed.

Defendants offer evidence that Corey exited his residence armed with two kitchen knives that he refused to drop, and that while holding the knives, Corey pushed his mother to the ground, leading Rutherford to reasonably believe that Corey posed an imminent threat to himself and others, particularly, his mother. Defendants also offer evidence that even though the initial deployment of Rutherford's taser caused Corey to fall to the ground, Rutherford's recycling of the taser four additional times was reasonable because Corey refused to drop the knives and surrender and, instead, kept trying to get up holding the knives. Defendants argue that by deploying his taser and continuing to recycle it four additional times Rutherford acted as an objectively reasonable officer would act at the scene of a tense and rapidly evolving situation in which an individual was armed with two kitchen knives.

Plaintiffs, however, offer evidence that Corey was not armed with kitchen knives and posed no threat to the officers or others and yet was tased five times, including four times after he lay incapacitated on the ground.  Accepting as true plaintiffs' version of the facts, which is supported by the summary judgment record, the court concludes that disputed facts in the record call into question both the excessiveness and the objective reasonableness of Rutherford's use of force and, whether at the time of the initial and subsequent tasings Rutherford reasonably believed that Corey posed an imminent risk of serious harm to himself or others.  If as plaintiffs contend, Rutherford tased Corey multiple times even though Corey was not armed with knives, a reasonable officer would view Rutherford's use of force as clearly excessive and objectively unreasonable.  Accordingly, the court concludes that there are genuine issues of material fact for trial regarding the excessiveness and reasonableness of Rutherford's conduct as to both the initial taser deployment and the subsequent recycling of his taser four additional times that a jury must determine at trial.

Since the Fifth Circuit has held that the law on the use of tasers was clearly established at the time of an event that occurred in 2007, long before the events at issue here, Rutherford is not entitled to qualified immunity under plaintiffs' version of the facts.  See Newman, 703 F.3d at 763-64 (recognizing that the law on the excessive use of force as it applies to tasers was clearly established in 2007).  Genuine issues of material fact

regarding the excessiveness and reasonableness of Rutherford's conduct as to the initial deployment and subsequent recycling of his taser four times preclude the court from granting Rutherford's motion for summary judgment.

    (b)  Officer Vaughan

Defendants argue that Vaughan's actions in holding a shotgun, and not interfering with Rutherford's use of his taser were objectively reasonable because she and Rutherford were faced with an armed, suicidal individual who had threatened firefighters, the police, and his parents.  Defendants argue that Vaughan's actions were not clearly excessive and were objectively reasonable and made on the basis of her reasonable belief that Corey posed an imminent threat to herself or to others of serious bodily injury or death.[32]

Asserting that before and throughout the tasing Vaughan had her shotgun pointed at Corey,[33] plaintiffs argue that "there can be no debate" that Vaughan seized Corey along with Rutherford.[34] Plaintiffs also offer undisputed evidence that after Corey

_____

[32]Defendants' MSJ, Docket Entry No. 65, pp. 26-28 (citing Vaughan Affidavit, Exhibit 20 to Defendants' MSJ, Docket Entry No. 65-20, ¶¶ 4-8).

[33]Plaintiffs' Response, Docket Entry No. 70, p. 23 (citing Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 46:23-47:16, 109:16-110:14; Corey Deposition, Exhibit A-1 to Plaintiffs' Response, Docket Entry No. 70-1, pp. 29:25-30:4; Mrs. Khansari Deposition, Exhibit A-2 to Plaintiffs' Response, Docket Entry No. 70-2, pp. 32:22-33:9).

[34]Plaintiffs' Response, Docket Entry No. 70, p. 23.

collapsed to the ground following Rutherford's initial deployment of his taser, Rutherford sought guidance from Vaughan about what to do next because Vaughan was a senior officer.    Vaughan told Rutherford to "tase him again," and watched Rutherford recycle his taser four times in rapid succession despite knowing that Corey had been hit with a taser dart somewhere in his face.[35]    Like Rutherford, Vaughan argues that her conduct was not excessive or objectively unreasonable because Corey was armed with two knives that he refused to surrender even after being tased.    But because plaintiffs have presented evidence capable of establishing that Corey was not armed with knives, genuine issues of material fact preclude the court from granting Vaughan's motion for summary judgment.    See Whitley v. Hanna, 726 F.3d 631, 646 (5th Cir. 2013), cert. denied, 134 S. Ct. 1935 (2014) (recognizing that a bystanding officer who knew that a fellow officer was violating an individual's constitutional rights had a reasonable opportunity to prevent violation but chose not to act can be held liable for participating in his fellow officer's acts).

---

[35]Plaintiffs' Response, Docket Entry No. 70, p. 29 (citing Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 109:16-110:14).    See also Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, pp. 76:16-77:25 (acknowledging that he asked Vaughan for guidance and that Vaughan advised him to tase Corey again); Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 95:20-100:23 (acknowledging that she told Rutherford to tase Corey again, and that she watched Rutherford recycle his taser four times after the initial tasing knowing that one taser dart hit Corey somewhere in the face).

        (c)  Officers  McGowan,  Hernandez,  Hunter,  Herrera,  and
             Sergeant  Gaw  are  Entitled  to  Summary  Judgment

Defendants  argue  that  Officers  McGowan,  Hernandez,  Hunter,
Herrera,  and  Sergeant  Gaw  are  entitled  to  summary  judgment  on
Corey's  claims  because  all  these  defendants  arrived  at  the  Khansari
residence  after  Rutherford  had  deployed  his  taser.  In  support  of
this  argument  defendants  cite  not  only  the  affidavits  of  all  these
defendants,  each  of  whom  states  that  he  or  she  arrived  at  the  scene
after  the  taser  had  been  deployed  and  Corey  had  retreated  into  the
residence,  but  also  the  affidavits  of  Rutherford  and  Vaughan,  each
of  whom  states  that  they  called  for  a  supervisor  and  additional
units  after  the  taser  had  been  deployed.[36]

Plaintiffs  have  cited  evidence  capable  of  establishing  that
HPD  officers  other  than  Rutherford  and  Vaughan  arrived  at  the
Khansari  residence  before  Corey  was  tased,  and  argue  that  these
officers  acted  unreasonably  by  surrounding  Corey  with  drawn  weapons
thereby  creating  a  dangerous  situation  in  which  Rutherford
unreasonably  tased  Corey  multiple  times.[37]  But  plaintiffs  have  not
cited  any  evidence  capable  of  establishing  that  any  of  these  five

---

[36]Defendants'  MSJ,  Docket  Entry  No.  65,  pp.  28-30  (citing
Affidavit  of  J.  McGowan,  Docket  Entry  No.  65-21;  Affidavit  of
M.  Hernandez,  Docket  Entry  No.  65-22;  Affidavit  of  J.  Herrera,
Docket  Entry  No.  65-23;  Affidavit  of  S.  Hunter,  Docket  Entry
No.  65-24;  and  Affidavit  of  W.  Gaw,  Docket  Entry  No.  65-25);
Defendants'  Reply,  Docket  Entry  No.  95,  pp.  3-7  (citing  Rutherford
Affidavit,  Docket  Entry  No.  65-19,  ¶  8;  Vaughan  Affidavit,  Docket
Entry  No.  65-20,  ¶  9).

[37]Plaintiffs'  Response,  Docket  Entry  No.  70,  pp.  8,  23,  29.

-27-

defendants, i.e., McGowan, Hernandez, Herrera, Hunter, or Gaw, arrived at the Khansari residence before Corey was tased, or that any of them engaged in conduct that constituted a violation of Corey's constitutional right to be free from the excessive use of force.

Even assuming that these five defendants surrounded Corey Khansari with weapons drawn before Rutherford deployed his taser, plaintiffs have not argued that the act of surrounding Corey with weapons drawn constitutes a use of force that violated a clearly established constitutional right, that their use of force was excessive, objectively unreasonable under the circumstances, or the proximate cause of any injury. See Gonzales v. Flanagan, 102 F. App'x 404 (5th Cir. 2004) (per curiam) (officer's brandishing her weapon did not cause any injury to plaintiff and did not amount to excessive force) (citing Hinojosa v. City of Terrell, Texas, 834 F.2d 1223, 1229-30 (5th Cir. 1988) (show of force by gun-pointing is not constitutionally excessive force; fear alone caused as result of officer pointing gun at the plaintiff did not rise to the type of injury compensable under § 1983)).

Moreover, although plaintiffs allege in their Original Complaint that Officers McGowan, Hernandez, Herrera, Hunter, and Sergeant Gaw violated Corey's constitutionally protected rights by failing to prevent another officer's use of excessive force, plaintiffs have not cited any evidence capable of establishing that any of these officers knew a fellow officer would violate Corey

Khansari's constitutional rights, had a reasonable opportunity to prevent that violation, or chose not to act to prevent that violation from occurring.  See Whitley, 726 F.3d at 646 (citing Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995)).  Because plaintiffs have failed to cite any evidence capable of establishing that defendants McGowan, Hernandez, Herrera, Hunter, or Gaw engaged personally in conduct that deprived Corey of rights, privileges, and immunities secured by the Constitution or laws of the United States, these defendants are entitled to summary judgment.

**B.    Claims Asserted Against the City of Houston**

    **1.    Applicable Law**

In Monell v. Department of Social Services of the City of New York, 98 S. Ct. 2018 (1978), the Supreme Court held that municipalities are "persons" subject to suit under 42 U.S.C. § 1983, but that municipalities cannot he held liable on a respondeat superior basis, i.e., a municipality cannot be held liable simply because one of its employees violated a person's federal rights.  For a municipality to be held liable under § 1983, the municipality itself must cause the violation through its policies or customs.  Id. at 2037-38 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").  To establish municipal liability under § 1983, plaintiffs

-29-

must show the deprivation of a federally protected right caused by action taken "pursuant to an official municipal policy." . . . A plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."

Valle v. City of Houston, 613 F.3d 536, 541 (5th Cir. 2010), cert. denied, 13 S. Ct. 2094 (2011) (citing Monell, 98 S. Ct. at 2037-38, and quoting Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002)). When, as here, the acts about which plaintiffs complain are not acts fairly attributable to the local government itself, the Fifth Circuit has articulated two paths of proof:

1. A policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

Pineda, 291 F.3d at 328 (quoting Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). In Peterson v. City of Fort Worth, Texas, 588 F.3d 838 (5th Cir. 2009), the Fifth Circuit explained that "[w]here prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing

-30-

body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" Id. at 850 (quoting Webster, 735 F.2d at 842).   The Fifth Circuit also explained that "[a] pattern . . . requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" Id. at 851 (quoting McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir. 1989)).

2.   Application of the Law to the Undisputed Facts

Defendants argue that plaintiffs cannot establish that the City is liable under 42 U.S.C. § 1983 because plaintiffs can point to no policy or custom that was the proximate cause of the injuries Corey or his parents sustained, and cannot show a pattern of similar incidents and/or that serious incompetence or misbehavior was general or widespread throughout the police force.[38] Plaintiffs respond that the City is liable for the officers' deprivation of their constitutional rights because the City failed to adequately train Rutherford and Vaughan how to use a taser and how to handle an individual in a mental health crisis, that the City was deliberately indifferent to the failure to train its officers in these areas, and that the City's customs or practices of excessive force by use of taser were the moving forces behind the deprivation of their constitutional rights.[39]

_____

[38]Defendants' MSJ, Docket Entry No. 65, pp. 20-23.

[39]Plaintiffs' Response, Docket Entry No. 70, pp. 31-48. Although Plaintiffs' Second Amended Complaint, Docket Entry No. 20, also contains allegations that the City maintained a custom or
(continued...)

(a)  Custom and Practice of Excessive Force by Taser Use

Plaintiffs argue that the City's customs or practices of excessive force by the use of a taser were the moving forces behind the deprivation of their constitutional rights.  In support of this argument plaintiffs assert that the City exhibited a custom or practice of its officers (1) deploying their taser when unnecessary in the first place, including against persons for merely refusing to follow orders, and (2) excessively cycling their tasers for an excessive period of time after initially "darting" their subjects.[40] As evidence of these customs and practices, plaintiffs cite the report of their expert, Melvin L. Tucker ("Tucker"),[41] who plaintiffs argue "describes seven different prior incidents in his expert report where Houston officers deployed an excessive amount of cycles of the Taser."[42]  The seven incidents described by Tucker occurred over a period of approximately 32 months extending from February of 2009 to September of 2011.[43]

---

[39](...continued)
practice of failing to supervise HPD officers, plaintiffs have neither argued nor presented any evidence in support of a failure-to-supervise claim.

[40]Plaintiffs' Response, Docket Entry No. 70, pp. 46-48.

[41]"Tucker Expert Report," Exhibit B-3 to Plaintiffs' Response, Docket Entry No. 76-1.

[42]Plaintiffs' Response, Docket Entry No. 70, p. 46 (citing Tucker Expert Report, Exhibit B-3 to Plaintiffs' Response, Docket Entry No. 76-1, p. 13, and seven significant incident reports attached thereto).

[43]Id.

The seven incidents identified by Tucker fail to create a fact issue for trial both because the inference of illegality is not compelling, and because the sample of events is too small. The seven significant incident reports attached to Tucker's expert report merely state that a taser was deployed multiple times and the amount of time between each deployment. None of these seven reports contain factual background information showing that the multiple taser deployments were clearly excessive to the need or objectively unreasonable. The tasing-deployments documented in these seven reports could have been entirely proper under the circumstances and, therefore, constitutionally acceptable. The mere deployment or utilization of a taser does not automatically equate to a violation of the Fourth Amendment. If these tasing incidents all pass constitutional muster, then such incidents do not establish an <u>unconstitutional</u> custom or policy on behalf of the City. Moreover, seven incidents -- each ultimately offering equivocal evidence of compliance with the Fourth Amendment -- cannot support a pattern of illegality in one of the Nation's largest cities and police forces. <u>See</u> <u>Pineda</u>, 291 F.3d at 329 (finding eleven incidents of warrantless searches too few to create a disputed issue of fact on City custom or practice).

     (b)  Failure to Train

Plaintiffs argue that the City failed to adequately train Rutherford and Vaughan on the use of the taser,[44] and on how to

---

[44]Plaintiffs' Response, Docket Entry No. 70, p. 31.

handle an individual in a mental health crisis,[45] and that the City was deliberately indifferent to this failure of training. "A municipality's failure to train its police officers can without question give rise to § 1983 liability." <u>World Wide Street Preachers Fellowship v. Town of Columbia</u>, 591 F.3d 747, 756 (5th Cir. 2009) (citations omitted). However, when a plaintiff seeks to impose § 1983 liability on a municipality for its failure to train its employees, normal tort standards are replaced with heightened standards of culpability and causation. <u>City of Canton, Ohio v. Harris</u>, 109 S. Ct. 1197, 1204-05 (1989)).

> A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a "moving force" in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy.

<u>Valle</u>, 613 F.3d at 544 (citing <u>Sanders-Burns v. City of Plano</u>, 594 F.3d 366, 381 (5th Cir. 2010); <u>Pineda</u>, 291 F.3d at 332. In <u>Brown v. Bryan County, Oklahoma</u>, 219 F.3d 450, 460 (5th Cir. 2000), the Fifth Circuit explained that liability for failure to train "depends upon whether it should have been obvious . . . or . . . whether [there was] sufficient notice [ ] that the failure to train . . . was likely to lead to a violation of the Fourth Amendment." While a single incident may serve as the basis of liability, that violation must be an obvious consequence of the [failure to train]. <u>Id.</u>

---

[45] <u>Id.</u> at 39.

Plaintiffs argue that Rutherford's taser training was
inadequate because Taser International, Inc., the manufacturer of
the X26 Taser that Rutherford carried on November 25, 2011,
recommends that officers undergo recertification training, and
standard practice in the industry was for all officers carrying a
taser to undergo annual refresher training,[46] but that Rutherford
only received training on the X26 Taser at the academy, and had not
received any additional refresher training before the events at
issue occurred.[47]  Plaintiffs argue that because

> Rutherford had not received any training that instructed
> him not to use an excessive number of cycles while using
> the Taser . . . he believed the Taser could be cycled
> anytime the person was still presenting a threat or not
> complying with orders being given. . . Additionally,
> Officer Rutherford believed from his training that the
> general rule was to shoot the Taser in the central body
> mass. . . While Officer Rutherford was later trained to
> lower his aiming, this was not until the switch to a
> different taser, which was after the Incident giving rise
> to this case. . . .
>
> If Officer Rutherford would have completed his
> annual refresher training, he would have known that the
> preferred target zone had been changed in 2010 by Taser
> from the center mass to the lower torso to reduce the
> risk of hitting sensitive body areas. . . If he had
> undergone this training, he would not have tased Corey in
> the eye.  Had he undergone the training, Officer
> Rutherford would also have known that each cycling of the
> Taser is considered by the courts as a significant level
> of force and that using that significant level of force
> on Corey's face and head five separate times would likely

---

[46]Id. (citing Tucker Expert Report, Exhibit B-3 to Plaintiffs'
Response and Appendix F-IACP Training Key #583 attached thereto,
Docket Entry No. 76-1).

[47]Id. (citing Rutherford Deposition, Exhibit A-5 to Plaintiffs'
Response, Docket Entry No. 70-5, pp. 132:16-133:1).

be considered excessive under the circumstances. Officer
Rutherford would also have appreciated Corey's diminished
ability, while being subjected to such force, to comply
with verbal commands, especially with such extremely
limited time in between cyclings. If Officers Rutherford
and Vaughan had understood these things, they would have
understood that Corey's "failure" to follow commands to
stay on the ground could not justify multiple applica-
tions of the Taser.[48]

Plaintiffs argue that the failure to train Rutherford and

Vaughan on the use of tasers amounted to deliberate indifference to

the rights of persons with whom they would come into contact

because "based on the CED Program Performance Audit completed in

2008, the City knew that its officers demonstrated important

deficiencies with regard to the use of the Taser."[49] Plaintiffs

argue that

[t]hese deficiencies, all based on numerous Houston
Police incident reports reviewed by the Audit team, were
as follows:

- [T]he City should "place additional training
  emphasis on the officer's evaluation of the
  situation after each CED deployment and before
  subsequent deployments." . . .

- "Continue to emphasize when a suspect's behavior is
  actively aggressive so as to warrant CED use. The
  call for service/incident reports reflect a lack of
  understanding by a small number of officers of the
  difference between passively resisting and
  aggressively resisting and the alternatives
  available to overcome the resistance." . . .

- "Demonstrate how a subject has difficulty in
  complying with orders given by an officer while
  being subjected to CED deployment." . . .

---

[48]Id. at 32-33.

[49]Id. at 33.

- "Emphasize how to use the initial incapacitation period as an opportunity to gain control of the subject.  For example, demonstrate how to assume the proper position for handcuffing a subject.". . .[50]

Citing testimony of Officer Frank Webb ("Webb"), a City CIT trainer, plaintiffs argue that "the City still has no training whatsoever specifically concerning the use of tasers on those that are in a mental health crisis . . ., even though part of the paradox is that pointing a weapon at someone who is having a mental health crisis escalates the encounter."[51]   Relying on Webb's testimony and on the Fifth Circuit's opinion in Valle, 613 F.3d at 536, plaintiffs argue:

> The summary judgment evidence establishes that the City, including its policymakers, have been aware of the need for appropriate crisis intervention training since the mid to late 1990's and have been on notice that the lack of such training could result in constitutional violations.  Despite such knowledge, the City (prior to the encounter with Corey Khansari) failed to change its policy on encountering the mentally ill to include the use of crisis intervention techniques.  Furthermore, the City did not train its officers whatsoever specifically on the use of the taser on those in a mental health crisis and how such use would serve to escalate the encounter.

> In this case, in response to a mental health call arising from Corey's attempt at suicide by overdose, the

---

[50]Id. at 33 (citing Oral Deposition of Gasper Mir, III, Exhibit A-7 to Plaintiffs' Response, Docket Entry No. 71-1, pp. 24:5-26:1; and Conductive Energy Device Program Performance Audit, Exhibit B-2 to Plaintiffs' Response, Docket Entry No. 74-1, pp. 15-16).

[51]Id. at 43 (citing Oral Videotaped Deposition of Frank Webb ("Webb Deposition"), Exhibit A-9 to Plaintiffs' Response, Docket Entry No. 71-3, pp. 25:4-10, 27:4-15).

Defendant Officers arrived, drew their lethal weapons and
Tasers, approached Corey with their weapons pointed at
him, yelling, cursing, and ignoring the critical
information that Debra and Michael Khansari were trying
to convey.  Debra saw red dots on Corey, causing her to
fear for his life.  She then tried to protect her son.
Corey than saw the red dots from the Taser on his mother,
which caused him to fear for her life and prompted him to
push her out of harm's way, thus escalating the situation
to the point where Officer Rutherford discharged his
Taser into Corey's eye.  The Defendant Officers, through
their inexplicable and terrifying aggression, made a
violent situation out of a call for help, *even while
knowing it was a call for help*.  Like Valle and the other
prior incidents, the officers were inadequately trained
on crisis intervention.  This failure to train, to which
the City was deliberately indifferent, especially in the
wake of *Valle*, was the moving force behind the
deprivation of Corey's constitutional rights.[52]

In <u>Valle</u>, 613 F.3d at 536, the Fifth Circuit considered

whether the failure to implement mandatory CIT training constituted

an actionable municipal policy under § 1983.  The <u>Valle</u> plaintiffs

presented evidence that the City of Houston chose not to implement

a 2004 proposal for mandatory CIT training prepared at the

direction of the Executive Assistant Chief of Police.  <u>Id.</u> at 544-

45.  The court considered two recommendations made in the 2004

proposal:  "(1) that *all* patrol officers be required to complete

twenty-four hours of CIT training, and (2) that all patrol

*sergeants* be required to complete CIT training."  <u>Id.</u>  The court

reasoned that "[t]he 2004 proposal suggests that the City

recognized that mental health situations were not being adequately

dealt with by CIT-trained officers and that there was a need for

---

[52]Plaintiffs' Response, Docket Entry No. 70, pp. 44-45.

additional CIT training." <u>Id.</u>  The court held that the City's failure to implement those recommendations raised a genuine issue of material fact as to whether "the department's decision not to implement the CIT training recommendations in the 2004 proposal constituted an official policy of failing to adequately train." <u>Id.</u>  The plaintiffs in <u>Valle</u> still needed to show that the unconstitutional use of excessive force was the "highly predictable" consequence of sending non-CIT officers to a situation involving an individual with mental health issues.  <u>Id.</u> at 549. Because the plaintiffs could not make such a showing, the court concluded that they failed to satisfy the deliberate indifference prong.  <u>Id.</u>  Similarly, here, plaintiffs must show that the City was on notice that the unconstitutional use of force against a person with mental health issues was likely to result from the failure to provide sufficient taser and/or CIT training.

Missing from plaintiffs' briefing is any evidence capable of establishing that the City's taser and/or CIT training programs are defective, that Rutherford or Vaughan or any other HPD officer's lack of taser and/or CIT training had caused serious injuries resulting from excessive use of force by taser on previous occasions, or that there exists a prior pattern of conduct by Rutherford, Vaughan, or any other HPD officer of violating constitutional rights by using a taser to employ excessive force while assisting the HFD to respond to a call for medical assistance involving a person experiencing a mental health crisis.  Absent

-39-

such evidence plaintiffs have failed to raise a genuine issue of material fact for trial as to whether the City's taser and CIT training policies or procedures were inadequate. Also missing from plaintiffs' briefing is any evidence capable of establishing that the failure to provide Rutherford and Vaughan refresher taser training amounted to deliberate indifference to the rights of citizens to be free from excessive use of force by taser. See Valle, 613 F.3d at 544.

Nor can plaintiffs rely on the single incident theory (i.e., the utilization of the taser on Corey) to prove their claims. "The single incident exception . . . is a narrow one, and one that [the Fifth Circuit has] been reluctant to expand." Burge v. St. Tammany Parish, 336 F.3d 363, 373 (5th Cir. 2003) (citing Pineda, 291 F.3d at 334-35). The Fifth Circuit "has considered single violation liability several times, and, with only one exception in some thirty years since Monell, has 'consistently rejected application of the single incident exception.'" Thompson v. Connick, 578 F.3d 293, 299 (5th Cir. 2009), reversed on other grounds, Connick v. Thompson, 131 S. Ct. 1350 (2011).

The sole exception, Brown v. Bryan County, Oklahoma, involved a failure to train a neophyte on the constitutional limits of the use of force. 219 F.3d 450 (5th Cir. 2000). The facts of Brown demonstrate that single violation liability applies only in extreme circumstances. In Brown the offending officer was a young, inexperienced reserve deputy who was not only related to the

sheriff, but also had been on the job for only a few weeks and had no education or experience whatsoever in law enforcement.  Id. at 452 and 458.  Moreover, shortly before joining the sheriff's office he had been arrested for several crimes, including assault and battery.  Id. at 454.  Typically, application of the single incident exception requires evidence of the proclivities of the particular officer involved in the excessive use of force.  See Valle, 613 F.3d at 549.

Here, the City has presented undisputed evidence that Rutherford and Vaughan had both been trained according to state standards on the use of tasers, and that both are trained Crisis Intervention Team officers.[53]  "[The Fifth Circuit] consider[s] compliance with state requirements as a factor counseling against a 'failure to train' finding."  Zarnow v. City of Wichita Falls, Texas, 614 F.3d 161, 171 (5th Cir. 2010) (citing Conner v. Travis County, 209 F.3d 794, 798 (5th Cir. 2000)).  Likewise, the Fifth Circuit has explained that when officers have received training as required by state law, the plaintiff must show that the legal minimum of training was inadequate.  See Benavides v. County of

---

[53]Defendants' MSJ, Docket Entry No. 65, pp. 11-12 (citing Expert Report of John H. Chen, Assistant Chief of Police Staff Services Command Houston Police Department, Exhibit 9 to Defendants' Designation of Experts/Expert Disclosure, Docket Entry No. 59-2, pp. 4-7; Rutherford Deposition, Exhibit A-5 to Plaintiffs' Response, Docket Entry No. 70-5, p. 166:3-20; Vaughan Deposition, Exhibit A-6 to Plaintiffs' Response, Docket Entry No. 70-6, pp. 134:6-135:5; Rutherford Certification Records and Vaughan Certification Records, Exhibits 12-13 to Defendants' MSJ, Docket Entry Nos. 65-12 and 65-13).

Wilson, 955 F.2d 968, 973 (5th Cir. 1992).  Such evidence has not been presented in this case.  "[T]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city for the officer's shortcomings may have resulted from factors other than a faulty training program." McIntosh v. Smith, 690 F. Supp. 2d 515, 536 (S.D. Tex. 2010) (quoting City of Canton, 109 S. Ct. at 1206).  The "vigorous test" of "deliberate indifference," Brown, 219 F.3d at 461, is required because a lesser standard of fault and causation would open municipalities to unprecedented liability under § 1983 that would result in de facto respondeat superior liability on municipalities -- a result the Supreme Court rejected in Monell.  See City of Canton, 109 S. Ct. at 1206.  As the court noted in Brown, 219 F.3d at 460, liability for failure to train "depends upon whether it should have been obvious . . . or . . . whether [there was] sufficient notice [ ] that the failure to train [Rutherford and Vaughan] . . . was likely to lead to a violation of the Fourth Amendment rights of those [they] would encounter."

Plaintiffs have not presented evidence that the risk of injury to citizens arising from a violation of rights protected by the Fourth Amendment was the obvious, highly predictable consequence of a lack of specific training on the use of a taser on those experiencing a mental health crisis.  See McIntosh, 690 F. Supp. 2d at 536.  Plaintiffs have "not shown that the City had any notice, much less 'sufficient notice,' that tasers had previously resulted

in [loss of vision or escalation of encounters with mentally ill individuals]." Id. (quoting Brown, 219 F.3d at 458). Nor have plaintiffs offered evidence that before the incident at issue here, Rutherford or Vaughan had been accused of unreasonable or excessive use of force, or of unreasonable or excessive use of force by taser on mentally ill persons.

Even assuming that the evidence plaintiffs have cited was capable of creating a factual dispute as to whether Rutherford or Vaughan was sufficiently trained in the use of tasers or CIT, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." McIntosh, 690 F. Supp. 2d at 536 (citing City of Canton, 109 S. Ct. at 1206). In this case no reasonable fact-finder could conclude that a risk of injury to citizens was the "obvious," "highly predictable consequence" of a lack of specific training on the use of a taser on those in a mental health crisis that would cause the violation of rights protected by the Fourth Amendment. Plaintiffs have simply not shown that the City had any notice, much less sufficient notice, that inadequate taser or CIT training had previously resulted in an injury of the type experienced by Corey.

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make

-43-

> *mistakes; the fact that they do says little about the*
> *training program or the legal basis for holding the city*
> *liable.*

Pineda, 291 F.3d at 333 (quoting City of Canton, 109 S. Ct. at 1206).  Accordingly, the court concludes that the City is entitled to summary judgment on the plaintiffs' claims for failure to train Rutherford and Vaughan either on the use of tasers or on the use of tasers on those experiencing a mental health crisis.

## IV.  Texas Tort Claims Act Claims

Citing the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code §§ 101.001, et seq., and asserting that Corey's injuries and his parents' damages were proximately caused by Rutherford's negligent misuse of the City's tangible personal property, i.e., the X26 Taser with which Rutherford tased Corey, plaintiffs argue that Corey may recover individually for his injuries, and that his parents may recover individually as bystanders for their severe mental anguish and emotional distress.[54]  A Texas municipality may not be held liable for Texas common law causes of action unless the Texas legislature has waived its governmental immunity.  City of Watauga v. Gordon, 434 S.W.3d 586, 589 (2014).  Immunity is only waived for claims brought under the TTCA, Tex. Civ. Prac. & Rem. Code §§ 101.001, et seq.  Id.  In pertinent part, the TTCA requires state law claims to arise in one of two ways:  (1) from the conduct of a governmental unit's employee that involves the operation of a

---

[54]Plaintiffs' Response, Docket Entry No. 70, pp. 48-53.

motor-driven vehicle or equipment; or (2) from the condition or use of tangible personal property or real property if the governmental unit would, were it a private person, be liable to the claimant under Texas law.  Tex. Civ. Prac. & Rem. Code § 101.021.  The TTCA prohibits claims for intentional torts.  Id. at 101.057.  A claim properly stated as an intentional tort may not be restated as a claim for negligence.  Lopez-Rodriguez v. City of Levelland, Texas, 100 F. App'x 272, 275 (5th Cir. 2004) (per curiam).  Citing the Fifth Circuit's holding in Lopez-Rodriguez and the Texas court of appeal's holding in City of Lubbock v. Nunez, 279 S.W.3d 739, 742 (Tex. App. — Amarillo, 2007, pet. dismissed), this court concluded that the plaintiffs' allegations that the defendant officers injured Corey and his parents by firing their tasers at Corey negligently were not subject to dismissal at an earlier stage of this action.  See Khansari, 14 F. Supp. 3d at 873.

Citing Gordon, 434 S.W.3d at 586, defendants argue that after this court's denial of the City's motion to dismiss plaintiffs' state law claims, the Texas Supreme Court clarified that such claims cannot be both intentional and negligent, and that the City's immunity from such claims is not waived.[55]  In Gordon the Texas Supreme Court held that a plaintiff's claim that handcuffs were negligently fastened too tightly by a police officer effecting an arrest, causing the plaintiff injury, did not state a claim

_____

[55]Defendants' MSJ, Docket Entry No. 65, pp. 16-19.

under the TTCA for which immunity had been waived.   The Court
explained that "when an arrest, lawful in its inception, escalates
into excessive-force allegations, the claim is for battery alone."
Id. at 593.   In reaching its holding the Texas Supreme Court
rejected both of the cases on which this court relied in denying
the City's motion to dismiss the plaintiffs' TTCA claims explaining
that "the distinction drawn in Reed Tool between intentional and
accidental injuries is not particularly helpful in distinguishing
battery from negligence," and that the conclusion of Nunez "is
doctrinally unsound."   Id. at 594.   Based on the Texas Supreme
Court's holding in Gordon the City argues that

> Plaintiffs' claim that Officer Rutherford (or any other
> officers) acted negligently in the course of
> intentionally firing his taser does not state a
> negligence claim for which immunity has been waived under
> the TTCA, and all of Plaintiffs' state law negligent
> claims should be dismissed, including the bystander
> liability claims.[56]

Asserting that Gordon is distinguishable based on "[t]he
sequence of events that led to Corey Khansari's injuries"[57]
plaintiffs argue that the holding in Gordon is inapplicable here
because

> [t]he excessive force that injured Corey was the result
> of the negligent *manner* in which the Taser was used,
> rather than an escalation of intended contact.   The
> officer aimed the Taser in an improper way and, as a
> result, hit Corey in the eye.   Accordingly, the contact
> that resulted — a Taser to the eye — was not the contact

---

[56]Id. at 19.

[57]Plaintiffs' Response, Docket Entry No. 70, pp. 50-51.

that was intended.  In [Gordon], the act of handcuffing
the individual was the type of contact that was intended
and it was escalated to a harmful degree by the
tightening, which was intentional.  434 S.W.3d at 593-94.
Here, the officer improperly and negligently aimed the
Taser, which created a type of contact to Corey that was
not intended.  Accordingly, the claim arises out of the
negligent use of the Taser by the officer, not a
battery.[58]

Plaintiffs cite Escobar v. City of Houston, Civil Action No. 04-

1945, 2007 WL 2900581, *43 (S.D. Tex. September 29, 2007), as an

example of a case in which the district court denied the city's

motion for summary judgment on TTCA claims arising from a shooting

because the defendant officer "stated that he did not mean to

discharge his weapon and that he recalls being bumped on his hand

or arm just before the gun went off."[59]

Plaintiffs' attempt to distinguish Gordon is not persuasive.

In Gordon the Texas Supreme Court held as a matter of state law,

"[c]laims of excessive force in the context of a lawful arrest

arise out of a battery rather than negligence, whether the

excessive force was intended or not."  Id. at 593.  Plaintiffs have

alleged that Corey's injuries and the injuries that his parents

suffered as bystanders arise from Rutherford's excessive use of

force in tasing Corey multiple times.  Undisputed facts establish

that Rutherford's tasing of Corey was intentional, not negligent.

For this reason the facts of this case are distinguishable from

---

[58]Id.

[59]Id. at 51.

-47-

those of _Escobar_ where the defendant officer stated that his gun
discharged accidentally, not intentionally.  As in _Gordon_ where the
act of tightening the plaintiff's handcuffs was an intentional act
regardless of whether the handcuffs were tightened to an excessive
degree, so too the acts of tasing Corey multiple times were
intentional acts regardless of where the taser darts hit Corey's
body.  As the Texas Supreme Court observed, "there is no such thing
as a negligent battery, since battery is defined to require an
intentional touching without consent not a negligent one."  _Id._ at
594.  In light of the Texas Supreme Court's holding in _Gordon_,
there can be no doubt that in Texas use of excessive force by a
police officer is an intentional tort, and "to be viable, the
[TTCA] claim cannot arise out of an intentional tort."  _Gordon_, 434
S.W.3d at 589.  Accordingly, the City of Houston is entitled to
summary judgment on the state law tort claims that Corey and his
parents have asserted against it because the City is immune from
liability on those claims and that immunity has not been waived by
the TTCA.

## V.  Conclusions and Order

For the reasons stated in § III.A., above, the court concludes
that Officers McGowan, Hernandez, Hunter, Herrera, and Sergeant Gaw
are entitled to summary judgment on claims that plaintiffs have
asserted against them under 42 U.S.C. § 1983 for the excessive use
of force against Corey Khansari in violation of the Fourth

Amendment, but that genuine issues of material fact preclude the court from granting summary judgment to Officers Rutherford and Vaughan on these claims. For the reasons stated in § III.B, above, the court concludes that the City of Houston is entitled to summary judgment on the claims that all plaintiffs have asserted against it under 42 U.S.C. § 1983. For the reasons stated in § IV, above, the court concludes that the City of Houston is entitled to summary judgment on the claims that all the defendants have asserted against it under the Texas Tort Claims Act. Accordingly, Defendants' Motion for Summary Judgment (Docket Entry No. 65) is **GRANTED in PART and DENIED in PART.**

The joint pretrial order will be filed by December 4, 2015, Docket call will be on December 11, 2015, at 3:00 p.m. in Courtroom 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 28th day of October, 2015.

SIM LAKE
UNITED STATES DISTRICT JUDGE